The CITY AND COUNTY OF HONOLULU, etc., Plaintiff,

v.

HAWAII NEWSPAPER AGENCY, INC., et al., Defendants.

Civ. No. 79–0138.

United States District Court, D. Hawaii.

Feb. 10, 1983.

Josef D. Cooper, Tracy R. Kirkham, Kirk A. McKinney, Cooper, Kirkham, Hainline & McKinney, P.C., San Francisco, Cal., Gary M. Slovin, Corp. Counsel, Honolulu, Hawaii, J. Michael Hennigan, Bretz & Hennigan, A Law Corp., Los Angeles, Cal., for plaintiff.

William M. Swope, William A. Cardwell, Cades Schutte Fleming & Wright, Martin Anderson, David J. Reber, Lani L. Ewart, Vincent A. Piekarski, Goodsill Anderson Quinn & Stifel, Honolulu, Hawaii, John Stuart Smith, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for defendants.

## OPINION

CURTIS, District Judge.

The City and County of Honolulu as plaintiff[1] brings this antitrust action against the Star-Bulletin and the Honolulu Advertiser,[2] two daily newspapers published in Honolulu. The complaint alleges that in 1962 the two newspapers entered into a contract, combination and conspiracy to unreasonably restrain trade in violation of section 1 of the Sherman Act, Title 15 U.S.C. § 1, and in a conspiracy to monopolize trade and commerce in violation of section 2 of the Sherman Act, Title 15 U.S.C. § 2. The

1. The City and County of Honolulu is a municipal corporation, a single entity.

2. This action was originally brought by the City as a class action on behalf of all advertisers,

roots of this alleged combination and conspiracy extend back to May 31, 1962 when these newspapers entered into a Joint Operating Agreement (JOA), merging their commercial and mechanical operations under the terms of which, among other things, they set combined circulation and advertising rates.

By way of defense, the defendants contend that such agreement comes within the exemption provisions of the Newspaper Preservation Act (NPA), Title 15 U.S.C. § 1801, et seq., and in any event the action is barred by the statute of limitations or laches.

The court bifurcated the issues and proceeded to try the issues of laches and the applicability of the exception. This trial resulted in a mistrial as the jury was unable to reach a unanimous verdict. However, prior to submitting the case to the jury the defendants moved for a directed verdict on both the issues of laches and immunity, which motion the court took under submission, announcing its intention to withhold a ruling thereon until after the jury had returned a verdict. The parties agreed that the motion might be deemed a motion for judgment notwithstanding the verdict should the jury return a verdict unfavorable to the defendants. The court now has before it defendants' motion for judgment on these issues and for reasons which will hereinafter appear, the court concludes that this action is barred by the statute of limitations, and that the defendants are entitled to judgment as a matter of law on the exemption issue.

## FACTUAL BACKGROUND

Let me begin with a brief review of the facts which have given rise to this controversy.

On May 31, 1962, the defendant newspapers entered into a JOA providing for the merger of their respective commercial and

but no class was ever certified and at this point, at least, the City is proceeding on its own account.

mechanical departments for a period of thirty years, pursuant to which agreement subscription and advertising rates were jointly determined and profits were pooled and distributed according to an agreed formula. However, their respective editorial departments remained separate and independent. This was the type of arrangement which the Supreme Court in *Citizens Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), held violated sections 1 and 2 of the Sherman Act. This Supreme Court decision in *Citizens*, however, alerted Congress to the rash of newspaper failures occurring throughout the United States, especially in those larger cities unable to support multiple daily newspapers. Congress was concerned with the resulting diminution in editorial output caused by this trend, and it feared that many localities would be left with only one editorial voice if the trend were to continue. In some communities daily newspapers rescued themselves from extinction by merging their commercial operations with those of a competing paper, while leaving their respective editorial staffs independent and competitive. In an attempt to preserve editorial competition within such communities, even at the risk of suffering some commercial anticompetitive impact, Congress passed the NPA in 1970, which, among other things, granted antitrust immunity to newspapers having previously entered into such agreements where those agreements met the standards set forth in the Act.[3] As to any future combinations, Congress granted immunity only upon the consent of the Attorney General.

## STATUTE OF LIMITATIONS

Early in this litigation, this court ruled that the statute of limitations was not a bar to this action. However, defendants request this court to again consider that issue and, having done so, I have a different view from that which I have previously expressed.

This action was filed on March 23, 1979, some seventeen years after the JOA was entered into, and some nine years after the effective date of the NPA. Defendants urge again that this action is barred by the provisions of 15 U.S.C. § 15b,[4] which establishes a limitation period of four years on antitrust actions. The plaintiff urges that in light of the allegations of continuing anticompetitive conduct the statute is not applicable on the theory of "continuing violations," citing *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The *Zenith* Court explained the applicability of this theory as follows:

> The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is "commenced within four years after the cause of action accrued," 15 U.S.C. § 15b, . . . Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. *See, e.g., Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd.*, 185 F.2d 196, 208 (CA9 1950); *Bluefields S.S. Co. v. United Fruit Co.*, 243 F. 1, 20 (CA3 1917), appeal dismissed, 248 U.S. 595, 39 S.Ct. 136, 63 L.Ed. 438 (1919); *2361 State Corp. v. Sealy, Inc.*, 263 F.Supp. 845, 850 (ND Ill.1967). This much is plain from the treble-damage statute itself. 15 U.S.C. § 15. In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to

---

**3.** 15 U.S.C. § 1803(a) provides:

> It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication.

**4.** Any action to enforce any cause of action under sections 15, 15a, or 15c of this title shall forever be barred unless commenced within four years after the cause of action accrued.

him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. *See, e.g., Crummer Co. v. Du Pont,* 223 F.2d 238, 247–248 (CA5 1955); *Delta Theaters, Inc. v. Paramount Pictures, Inc.,* 158 F.Supp. 644, 648 (ED La.1958); *Momand v. Universal Film Exchange, Inc.,* 43 F.Supp. 996, 1006 (Mass.1942), *aff'd,* 172 F.2d [37] at 49. However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. *See, e.g., Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.,* 153 F.Supp. 589, 593 (NJ 1957); *Momand v. Universal Film Exchange, Inc., supra,* at 1006. *Cf. Lawlor v. Loewe,* 235 U.S. 522, 536 [35 S.Ct. 170, 172, 59 L.Ed. 341] (1915). Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

401 U.S. at 338–39, 91 S.Ct. at 806.

The Court then goes on to point out that whereas future damages may not be recovered if they are speculative or unprovable, they may be recovered in future actions if they do in fact occur.

In *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68 (9th Cir.1979), the court refused to apply the continuing violation theory. In that case AMF, the plaintiff, brought a treble damage antitrust action against the automobile manufacturers alleging conspiracy not to produce plaintiff's air pollution control device. In that case the court held that the refusal of the defendants constituted a single irrevocable act which, if unlawful, would have given rise to a cause of action at the time of the refusal, and since the action had not been brought within the time allowed, thereafter, it was barred by the statute of limitations. In *Multidistrict* the court said:

> In *Poster Exchange,* [*Inc. v. National Screen Service Corp.,* 517 F.2d 117 (5th Cir.1975)] *supra,* the Fifth Circuit clearly distinguished between injury final at its inception and a continuing wrong. A conspiracy had excluded Poster Exchange from access to supplies for a period stretching beyond the four-year limitations period. The court, unable to determine whether during the limitations period there was "a mere absence of dealing, or whether there was some specific act or word" of a wrongful nature, remanded for a determination of whether such acts or words occurred within the period. 517 F.2d at 128. Nevertheless, the court recognized: ["]Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.["]

591 F.2d at 72.

With the teachings of these cases in mind we now turn to an analysis of the facts. Admitting, as I think we must, that the alleged anticompetitive conduct is continuous within the meaning of *Zenith,* nevertheless, this conduct must be shown to be unlawful before we can apply the continuing violation rule, for unless the continuing conduct is unlawful the rule has no meaning. In *Zenith, In re Multidistrict Vehicle Air Pollution, Poster Exchange,* and their progeny dealing with the continuing violation rule, all assume the alleged anticompetitive conduct to be unlawful. Here the issue of whether the conduct is unlawful or not lies at the very heart of the problem. Section 1803 provides that the conduct complained of by the plaintiff here is "not unlawful" if carried on by a newspaper which qualifies for the exemption. Our first task, there-

fore, before considering the application of the continuing violation rule is to determine whether or not the newspapers qualify for the exemption. This inquiry takes us back to 1962 when the JOA was entered into. The formation of this agreement and the negotiations which led up to it constitute a single episode which had an immediate and permanent impact upon the plaintiff, for its avowed purpose was to engage in anticompetitive activity which could affect the plaintiff. The plaintiff could have brought an action challenging such a combination any time after its creation in 1962 up until 1970 without respect to the limiting statute, for during this period the theory of continued violations would have been applicable.

However, with the passage of the NPA, plaintiff's potential claim took on a somewhat different aspect. After the NPA, the theory of continuing violation could not be used to prevent the statute from running without a determination that the newspapers did not qualify for the exemption, for if they did, the alleged conduct was not unlawful and its continuation could not give rise to new causes of action.

When, then, did the cause of action which plaintiff here asserts first accrue? In my view, although the eligibility requirements contained in section 1803 are based upon conduct which was final in 1962, plaintiff's right to challenge defendants' eligibility first occurred upon the passage of the NPA.

For example, an airline passenger buys a ticket for a specific flight in the future and on the day of departure finds that the airline has oversold the plane and is honoring tickets in the order of their issuance until the plane is filled. Although the airline's acceptance of the passenger on that flight depends upon when the passenger purchased the ticket, which occurred at an earlier time, his entitlement to board depends upon the application of a regulation which went into effect at the time of departure. It is at the time of departure that either he or other passengers have the first opportunity to challenge the application of the regulation. Similarly, the plaintiff's opportunity to challenge the defendants' eligibility for the exemption occurred for the first time the day the NPA went into effect. For four years thereafter, the plaintiff could have brought this action which would have determined whether the JOA, by its terms and considered in the light of the circumstances surrounding its creations, was such as to entitle the defendant newspapers to the exemption provisions of section 1803. Nothing has accrued since which could give rise to a new cause of action on this issue. It seems clear therefore that there can be no reliance upon the continuing violation rule. Since this action was not brought until nine years after the cause of action first arose, it is barred by the four year statute of limitations.

Furthermore, this ruling is consistent with the purposes of the limitation statutes. The Professors Areeda and Turner in their authoritative antitrust treatise discussed the importance of limitations in the antitrust field as follows:

Limitations serve the same functions here as elsewhere in the law: to put old liabilities to rest and to relieve courts and parties from "stale" claims where the best evidence may no longer be available. Repose may seem especially valuable in the antitrust world where tests of legality are often rather vague, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened. In addition, the disappearance of relevant evidence over time is often particularly pertinent in antitrust cases. Legality depends not only on the parties' acts but on many surrounding circumstances, including the behavior of rival firms and general market conditions—matters which may be hard to reconstruct long afterwards.

II P. Areeda & D. Turner, *Antitrust Law* ¶ 325a at 119 (1978).

Plaintiff complains that this solution is illogical and cites as an example: Litigant A sues the newspapers in 1973, a time clearly within any statutory period. He assumes that the case results in a determination of

liability and damages for advertising purchased up through the time of the trial. Future damages would have been disallowed as speculative. He then supposes that Litigant B opens a business in Hawaii in 1976, and immediately begins to pay illegally fixed prices for advertising, from which he concludes that regardless of the fact that he sustained no previous damages and therefore had no earlier opportunity to sue, his action might nevertheless be barred. In the first place it is clear that if Litigant A sued the newspapers in 1973, which resulted in a finding of liability and damages for advertising purchased up through the time of the trial, although the plaintiff might not be entitled to future damages because they would be speculative and unprovable, in any subsequent action he could rely upon the previous ruling in his favor establishing liability which would then permit the continuing violation theory to apply, thus permitting him to recover any future damage from continuing unlawful competitive conduct. Insofar as Litigant B is concerned, the statute of limitations begins to run from the first time he has an opportunity to sue, and would therefore begin to run from the first occasion he suffers damage from illegal anticompetitive conduct.

## CONCLUSION

For eight years, from 1962 until 1970, the plaintiff sat idly by and failed to complain of the defendants' conduct at a time when such a complaint might have been meritorious. For some nine years, from 1970 until this action was filed in 1979, it failed to assert a cause of action which, if it exists at all, arose in 1970. For a period of four years from 1970 there existed an appropriate forum in which plaintiff's complaints could have been heard and determined. In the event a court during that period had determined the defendants' conduct to be illegal, plaintiff's prayer for injunctive relief would undoubtedly have been granted. The separation of the complex merger of the commercial operations of these two newspapers could have been undone and damages, if any, would have been minimiz-

ed. Plaintiff's delay in bringing this action has compelled the defendants to face the very difficulties which the limitation statutes are intended to prevent. As was said in *Poster Exchange:*

> The function of the limitations statute is simply to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring the proof of wrongs embedded in time-passed events.

517 F.2d at 127.

I hold therefore that this action is barred by the four year statute of limitations.

## LACHES

As an additional defense, the defendants urge laches. Although the evidence overwhelmingly supports this defense, having found that there is an applicable statute of limitations, the defense of laches is unavailable. *Straley v. Universal Uranium & Milling Corp.,* 289 F.2d 370 (9th Cir.1961).

## MOTION FOR DIRECTED VERDICT

We come now to a consideration of defendants' motion for a directed verdict. This court is well aware of the well established principle that a directed verdict is only appropriate when the court finds that viewing the evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party and without weighing witnesses' credibility, a reasonable jury could reach but one conclusion as to the verdict. *Marquis v. Chrysler Corp.,* 577 F.2d 624, 639 (9th Cir.1978). There is abundant authority to the effect that directed verdicts may be granted when appropriate, even in complex antitrust cases involving issues of motive, intent and the like. *See Santa Clara Valley Distributing Co. v. Pabst Brewing Co.,* 556 F.2d 942 (9th Cir. 1977). Furthermore, the use of the motion for directed verdict in cases where the jury has failed to reach a decision has been held appropriate. *See, Noonan v. Midland Capital Corporation,* 453 F.2d 459, 463 (2d Cir. 1971), *cert. denied,* 406 U.S. 945, 92 S.Ct.

2044, 32 L.Ed.2d 333 (1972); *O'Brien v. Thall,* 283 F.2d 741 (2d Cir.1960); *Daniels v. Pacific-Atlantic S.S. Co.,* 120 F.Supp. 96 (E.D.N.Y.1954).

In this phase of the case the jury was confronted with the issue of whether or not the newspapers were qualified for the exemption provided in section 1803. More specifically, was the Honolulu Advertiser, at the time the joint operating agreement was entered into, likely to remain or become a financially sound publication.

## FACTUAL ISSUE

In framing the issue for submission to the jury, this court concluded that the "likelihood of the Advertiser remaining or becoming financially sound" was not a question of fact since it had not nor could it ever occur. It appeared rather to be a matter of judgment as to what might occur in the future. Being a matter of judgment, reasonable people might well disagree, in which case, whose judgment controls?

Congress provided that such judgment should be made by the Attorney General as to all JOA's made after the NPA went into effect, for his approval was required before any new or amended JOA's could become effective. But as to JOA's entered into before the NPA, no such approval was required.

In the absence then of any indication from Congress as to whose judgment should control in such instances, we must fall back on such inferences as seem reasonable under the circumstances. Congress must have anticipated that such judgments would have been made by the managing officers of the newspapers as those most knowledgeable and most concerned. Since no procedural review was provided, Congress must have assumed that that judgment made by the management would have been controlling, certainly if it were made in good faith and with a reasonable basis in fact.

█ In my view, therefore, such a judgment is in the nature of a business judgment, a judgment made by management in the regular course of business, a judgment generally held to be conclusive.

There is ample authority for the business judgment rule and it has been recognized recently in this circuit. *Shivers v. Americo,* 670 F.2d 826, 832 (9th Cir.1982). *See also, Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973); *State Teachers Retirement Bd. v. Fluor Corp.,* 500 F.Supp. 278 (S.D.N.Y.1980), *aff'd in relevant part,* 654 F.2d 843 (2d Cir.1981). Accordingly, the jury was instructed as follows:

> The decision as to whether the Honolulu Advertiser was likely to remain or become financially sound is a business judgment, the kind of judgment which business men in management positions are called upon to make in directing the affairs of their respective enterprises. The soundness of such decisions when made in good faith and with a reasonable basis cannot ordinarily be challenged in a court of law. If, after considering the facts in this case you find that the managing officers of the Honolulu Advertiser entered into the joint operating agreement in the honest belief that otherwise the Honolulu Advertiser was not likely to remain or become financially sound, and that belief had a rational basis in fact, you must find that the defendants are qualified for the exemption provided in the Newspaper Preservation Act and render your verdict in favor of the defendants.

## REASONABLE BASIS IN FACT

This case is rather unusual in that although the facts are voluminous and complex, few are in dispute. The controversy here arises from the differing conclusions and inferences which the parties would have the jury draw from these largely uncontested facts.

For instance, working from exactly the same undisputed raw material, plaintiff's expert, a member of a widely known accounting firm with impressive credentials, after he and his staff had expended

some 3,000 hours and incurred a fee of some $300,000, concluded that the Honolulu Advertiser was not only sound, but was prospering and was in fact on its way to becoming an outstanding successful enterprise, while the defendants' expert, also a member of a widely known accounting firm with equally impressive credentials, after spending some 2,500 hours and charging a fee of $250,000, concluded that the Advertiser had experienced a long period of diminishing success and without the help of a joint operating agreement had no hope of future success. Both sides have supported their contentions with graphs, charts, statistical comparisons and accounting adjustments which, by reason of some mysterious legerdemain for which the accounting profession is well known, have given both of these contrary contentions an aura of credibility which is completely beyond the ability of lay persons to comprehend, let alone weigh. Fortunately, it is not necessary in this case to decide which contention is more likely to be correct, for we need only to determine whether the managing officers of the Advertiser acted in a good faith belief that their newspaper was not likely to remain or become financially sound and whether that conclusion had a rational basis in fact.

Basically, it seems that the testimony of experts as well qualified as those testifying for the defendants, after 2,500 hours of research, concluding that the Advertiser was not financially sound and was not likely to become sound at the time the joint operating agreement went into effect, would be sufficient to compel a finding that the managing officers of the Advertiser had a rational basis for such belief. The fact that plaintiff's expert, whose credentials may be equally impressive, comes to an opposite conclusion does no more than suggest that there may be a rational basis for both conclusions, each one of which is just as probable as the other. Since the JOA was in fact entered into, there is no way of proving which conclusion would have been correct.

In fact, the expert testimony in this case has been of doubtful value. The testimony of the experts for both sides has been of necessity speculative and conclusional. They have used seventeen years of hindsight and present day sophisticated techniques to arrive at their own respective reconstructions of the same undisputed raw data only to reach diametrically opposed conclusions. They have largely neutralized, if not destroyed, the persuasiveness of each others testimony.

Furthermore, we must not lose track of the fact that the judgment we are testing here was formed by the management of the Advertiser in 1961–62 without the help of expensive specialists in the field. So, especially in dealing with the question of good faith, we must view the facts as they appeared to the management group in 1961–62.

## DEFINITION OF FINANCIAL SOUNDNESS

Before discussing the evidence, we must establish some definition of "financial soundness" as used in section 1803. In this connection, the court instructed the jury as follows:

> [Y]ou may consider the phrase "financially sound" as meaning "earning a reasonable profit." The phrase "likely to remain financially sound" means likely to earn a reasonable profit for a reasonable period of time. The phrase "likely to become financially sound" means likely to become able to earn a reasonable profit within a reasonable period of time. "Likely" means probable. Something is likely if it looks as if it would happen. [Court's Jury Instruction No. 23.]

Defendants' economist Rosse stated without contradiction that a "return on sales" was a proper measure of economic soundness,[5] and further testified that a normal return on sales for a going newspaper business was in the neighborhood of 12 to 16% before taxes. Although plaintiff's expert Stone used a 6% net return after taxes as a standard, this would translate into a rate of

---

5. Stone, however, preferred "return on equity" as a proper measure of economic soundness.

12% before taxes so that the difference between the two conclusions in this respect is insubstantial.

## ANALYSIS

I shall not attempt to treat all of the mass of statistical evidence with which the record is filled, much of which I consider irrelevant. I shall confine myself to a few undisputed facts which were known to the Advertiser's managers and were relied upon by them, facts which I find relevant and persuasive. As a starting point, a comparison between the Advertiser's return on sales and that of the Star-Bulletin for the years immediately preceding the JOA seems appropriate. Although the experts could not agree precisely on these profit figures, after making such adjustments as each thought appropriate, their differences were so insubstantial as to be irrelevant. The following is such a comparison for the years 1956 through 1959, showing the net income before taxes for each year as calculated by defendants' expert Rosse with the corresponding return on sales. It also shows the calculation as made by plaintiff's expert Stone and a comparison with the return on sales by the Star-Bulletin.

### Net Income (Losses) Before Tax

|  | Advertiser (Rosse) | Return On Sales | Advertiser (Stone) | Return On Sales | Star-Bulletin | Return On Sales |
|---|---|---|---|---|---|---|
| 1956 | $142,618 | 4.91% | $156,171 | 5.37% | $560,119 | 11.31% |
| 1957 | 20,537 | .66% | 30,204 | .96% | 658,528 | 12.37% |
| 1958 | 138,530 | 4.29% | 157,613 | 4.88% | 922,782 | 15.55% |
| 1959 | (51,796) | (1.39%) | 16,271 | .49% | 891,089 | 13.26% |

The greatest disparity between the calculations of Rosse and Stone appears for the year 1959; whereas, Rosse shows a loss of $51,796, Stone shows a profit of $16,271. During this year the Advertiser put out a statehood edition, commemorating Hawaii's admission to the Union. This edition was widely sold and produced a substantial amount of money. Mr. Rosse considered such an edition a one-of-a-kind event which was not likely to reoccur and, therefore, should not be considered in demonstrating statistical trends. Mr. Stone, on the other hand, included it. But, in any event, even taking Mr. Stone's figures during this period of four years, the Advertiser's return on sales varied from .49% to 5.37%; whereas, the Star-Bulletin ranged from 11.31% to 15.55%. Furthermore, it is apparent that the Advertiser was showing a downward trend; whereas, the Star-Bulletin was showing an upward trend. Defendants' position that even during this period the Advertiser was not financially sound has considerable support in the evidence.

But the worse was yet to come. In 1960, the Advertiser suffered a net loss of $110,-615; whereas, the Star-Bulletin had a net income of $888,591. In 1961, the Advertiser suffered a net loss of $72,395; whereas, the Star-Bulletin had a net income of $896,973.

The joint operating agreement went into effect May 31, 1962. Consequently, there were five months of independent operation by the Advertiser in 1962, prior to the JOA. It is this so called "stub" period which forms the principal basis for the difference of opinion of the two experts. Plaintiff contends that the statistics during this period indicate that the Advertiser had turned the corner and was on its way to an improved financial condition. The defendants, on the other hand, contend that such statistics are entirely irrelevant as they are incomplete and form no reliable basis for future projections. But even if they are relevant, defendants argue, when adjusted to reflect the true circumstances in which the statistics arose, they completely fail to support Mr. Stone's conjecture that the Advertiser had turned the corner and was on its way to success and prosperity.

During this stub period, it appears that the Advertiser made a net profit of $22,348,

which represents a return on sales of only 1.35%. This figure was not arrived at by the Advertiser's auditors until March of 1963, after the JOA was formed. During the first five months of 1962, the management only had before it monthly statements which were inconclusive. In three of the five months, the operation resulted in a loss, and in two profits were earned. Mr. Stone, by making various adjustments, arrives at a profit of $40,742 for the stub period, a return of 2.48% on sales, still far below the percentage of profit expected by a sound newspaper enterprise.

Furthermore, the defendants contend that the operating profit of $22,348 as shown by their auditors for the five-month period, if used at all, is subject to certain normalizing adjustments. It appears that their circulation manager, when he heard of the probability of the JOA, resigned as of the first of the year and was not replaced, which caused a saving of $6,000. Also, the promotion director likewise was terminated at an additional saving of $6,270. This, together with other normalizing adjustments totaling $31,510, indicates that had the Advertiser been operating in a normal fashion, and after a proper allocation of expenses on an annual basis, it would have sustained a loss during the five-month period of $14,666. As these facts are uncontested, they tend to refute plaintiff's contention that the fortunes of the Advertiser had turned for the better.

It is a well established fact that the life blood of the newspaper business is its advertising revenue. This in turn is dependent upon its circulation. Plaintiff contends that during the five-month period both advertising lineage and circulation showed an increase, which indicated that the Advertiser's financial position had turned the corner, and that it was on the way to a profitable operation.

It is uncontradicted that beginning in 1956 a strenuous effort was made on the part of management to improve the Advertiser. New personnel was brought in in an effort to improve the newspaper in all of its aspects. It was also admitted that the edi-torial content of the newspaper was greatly improved to the point that in the opinion of one witness, at least, the Advertiser was superior editorially to the Star-Bulletin. During this same period an intensive campaign was launched to increase both circulation and advertising lineage by the use of generous discounts, contests and other promotional devices. Although this effort did increase both the circulation and advertising lineage for the Advertiser, it did not produce a comparable increase in revenue. The effort, nevertheless, continued during the latter days of 1961 in order to enhance the Advertiser's negotiating position with the owners of the Star-Bulletin in forming a JOA, the necessity of which by that time had become apparent. The defendants point out that the slight increase in the circulation and advertising lineage during the stub period was the after effect of the high pressure promotion which was terminated at the end of 1961, and that such increased circulation and advertising lineage could not have been maintained without continuing the highly expensive promotional activity which produced it.

But beyond all this, the Advertiser was faced with an event which was to have a permanent, devastating effect upon its future. Prior to 1960, the Advertiser had one distinctive advantage over the Star-Bulletin in that it published a Sunday edition; whereas, the Star-Bulletin did not. Since many merchants preferred Sunday advertising, the Advertiser's Sunday edition had been an important source of revenue. In 1960, however, the Star-Bulletin management decided to put out a Sunday edition. This had a profound effect upon the market. Whereas, the Advertiser had a Sunday circulation during the last quarter of 1959 of 92,520, in the first quarter of 1960 after the Star-Bulletin came into the market with a Sunday circulation of 110,670, the Advertiser's Sunday circulation dropped for that quarter to 84,798, and during 1961 it continued to drop further. According to the testimony of the defendants' witnesses, at that time it became apparent to them that the Advertiser would continue to lose advertising lineage to the Star-Bulletin in the fu-

ture and that the Advertiser could no longer successfully compete. The Advertiser's managers then concluded that the only hope for their enterprise was to enter into some joint operating agreement with the Star-Bulletin.

█ There can be little question but that the evidence establishes, without serious conflict, a rational basis for the belief on the part of the management of the Advertiser that the only hope to maintain an editorial voice in the community was by combining the commercial portions of the two newspapers, as many other newspapers in similar financial conditions had done, and which was thought then to be permissible.

## GOOD FAITH

The management personnel of the Advertiser testified under oath that they believed in good faith that the Advertiser was not financially sound nor would become financially sound without entering into a joint operating agreement with the Star-Bulletin, and there is no hard evidence to the contrary. The plaintiff's charges of a lack of good faith are based entirely upon inferences which it seeks to have the jury draw from facts which neither warrant nor permit such inferences. It is abundantly clear that the finder of fact can draw only such inferences as are *reasonable* in the light of the evidence taken as a whole. The evidence here simply will not support those inferences of bad faith which the plaintiff suggests. I shall not attempt to discuss all which plaintiff mentions, but only a few where their unreasonableness may not be readily apparent.

Plaintiff points out that two members of the Board of Directors testified that they were unaware that the Advertiser was in bad financial condition and that the minutes of the meeting gave no such indication. These two members were Loren Thurston and Katsuro Miho, neither of whom were active in the management. The minutes of the meetings merely showed that the financial position of the company "was reported," but stated no details. These facts fall short of furnishing a basis for an inference of lack of good faith.

Plaintiff then refers to the evidence indicating that the matter of a possible JOA had been mentioned many times in previous years, obviously as a method of rescuing the Advertiser's operations, and that an expert in the field of antitrust law had been consulted in connection with a JOA. This is thoroughly consistent with the testimony as a whole, that the Advertiser had been in bad financial condition for some time, that the JOA had been considered as a possible solution, and that in accomplishing it the management did not wish to violate any antitrust law. Certainly these facts can give no support to an inference of bad faith.

Plaintiff makes much of Twigg-Smith's "goal" memorandum of March 21, 1961, wherein, Mr. Twigg-Smith indicated that he hoped for a larger share than was ultimately realized in the JOA, and in which he indicated an intention to continue the intensive promotion of advertising and circulation in order to strengthen the Advertiser's negotiating strength. Any inference from these facts of bad faith could not possibly be supported by these facts.

Plaintiff relies heavily upon the fact that during the years 1960–61, Twigg-Smith and his friends made various purchases of Advertiser stock, from which plaintiff would have us infer that these purchases were motivated entirely because of their desire to make an immediate profit. Mr. Chapman testified without contradiction that he bought the stock because of his interest in the enterprise of which he was a part, and that he believed he would not lose anything in the long run since the value of the assets, in the event of liquidation, would be sufficient to cover his investment. This testimony was supported by Mr. Chin Ho who said that the newspaper was more valuable dead than alive.

On one occasion, it appears that Mr. Twigg-Smith's brother told Mrs. Thurston, in an attempt to urge her to vote affirmatively for the JOA, that "we are going to make nothing but money." This statement is nothing more than an expression of opti-

mism which would not be unexpected from a stockholder who had endured through many of the corporation's unproductive years and finally has hopes of profit if the JOA goes into effect. This is completely irrelevant on the issue of good faith.

Plaintiff suggests that the Advertiser was not broke, as it could borrow money. One banker testified, however, that he had refused to loan the Advertiser money because he could see no way in which it could pay it back. Plaintiff speculates as to where and how loans could have been obtained. However, there is no evidence to indicate that a mere loan of money would have turned a losing operation into a profitable one. As the evidence indicates, one of the main reasons that the Advertiser could not be expected to become financially sound was that it was losing circulation and advertising to the much stronger Star-Bulletin, a trend which no loan would have reversed.

In my view, the evidence shows here without substantial conflict that the Advertiser had been in serious financial trouble for many years, in that it was not making a reasonable profit for a newspaper publishing company. In 1960–61, it suffered severe financial losses. Its managing officers, justifiably concerned with the future of the Advertiser, decided in 1961 to seek a JOA with the Star-Bulletin. It is further my view that the evidence shows without substantial conflict that the management negotiated and effected the creation of the JOA in the good faith belief that it was necessary in order to preserve the Advertiser's editorial staff as an editorial voice in the community separate and apart from that of the Star-Bulletin. The evidence further indicates without conflict that there was a reasonable basis in fact for such a belief. I conclude that no jury composed of reasonable people who understood and followed my instructions could come to any other conclusion in the light of the evidence taken as a whole.

I hold, therefore, that the defendant newspapers are entitled to the exemption from antitrust prosecution afforded by section 1803, and that they are therefore entitled to judgment as a matter of law.