HAWAII NEWSPAPER AGENCY, a Delaware Limited Partnership; Gannett Pacific Corporation, a Hawaii corporation dba The Honolulu Advertiser; Liberty Newspapers Limited Partnership, as Arkansas Limited Partnership dba The Honolulu Star–Bulletin, Plaintiffs–Appellees,

v.

Margery S. BRONSTER, in her official capacity as Attorney General of the State of Hawaii, Defendant–Appellant.

No. 96–15142.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1996.

Decided Dec. 24, 1996.

Girard D. Lau, Deputy Attorney General, Honolulu, HI, for defendant-appellant.

Jeffrey S. Portnoy (on the briefs), Cades Schutte Fleming & Wright, Honolulu, HI; Robert C. Bernius, Nixon, Hargrave, Devans & Doyle, Washington DC, for plaintiffs-appellees.

Before WALLACE, SCHROEDER and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Margery S. Bronster, in her official capacity as Attorney General of Hawaii, appeals from the district court's grant of summary judgment in favor of the Hawaii Newspaper Agency, Gannett Pacific Corp. (Honolulu Advertiser), and Liberty Newspapers (Honolulu Star–Bulletin). Attorney General Bronster contends that the district court erred in concluding that the Newspaper Preservation Act

preempted Hawaii's Act 243, that the plaintiffs presented a ripe First Amendment claim, and that Act 243 violated the First Amendment, the Due Process Clause, as well as the Equal Protection Clause. We affirm because we conclude that the Newspaper Preservation Act preempted the field of the regulation of joint operating agreements between newspapers.

## I.

In 1962, the Honolulu Advertiser was experiencing financial difficulty and was on the verge of failure. In order to prevent the newspaper's demise and preserve its editorial voice, the Advertiser entered into a joint operating agreement ("JOA") with the Honolulu Star–Bulletin on May 31, 1962. Under the JOA, the newspapers merged their commercial, circulation, and advertising departments, but maintained separate and independent editorial voices. The newspapers formed the Hawaii Newspaper Agency ("HNA") to carry out the JOA. The effect of the JOA was to cut costs and preserve two independent editorial voices in Honolulu.

In *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), the Supreme Court affirmed a district court's conclusion that a similar JOA between two newspapers in Tucson, Arizona violated federal antitrust laws. *Id.* at 135, 89 S.Ct. at 929. The Court also held that the Tucson newspapers' "only real defense" was the "failing company" defense, which applies only when one party to a JOA can prove it was facing a liquidation and had no available purchasers. *Id.* at 136–39, 89 S.Ct. at 929–32. The Tucson newspapers failed to meet this burden. *Id.* at 139, 89 S.Ct. at 931–32.

In response to that decision, Congress passed the Newspaper Preservation Act, 15 U.S.C. §§ 1801–1804 ("NPA").[1] H.R.Rep. No. 91–1193, 91st Cong., 2nd Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 3547. Congress explained that JOAs were necessary to maintain "a newspaper press editorially and reportorially independent and competitive in all parts of the United States." *Id.* at 3547. Congress found that "economic conditions have created a situation in which a large majority of American communities have already become one owner newspaper communities." *Id.* at 3548 (quoting remarks of Rep.

1. The Newspaper Preservation Act provides in pertinent part:

§ 1803. Antitrust exemptions

(a) It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: *Provided,* That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.

(b) It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

(c) Nothing contained in the chapter shall be construed to exempt from any antitrust law any predatory pricing, any predatory practice, or any other conduct in the otherwise lawful operations of a joint newspaper operating arrangement which would be unlawful under any antitrust law if engaged in by a single entity. Except as provided in this chapter, no joint newspaper operating arrangement or any party thereto shall be exempt from any antitrust law.

§ 1804. Reinstatement of joint operating arrangements previously adjudged unlawful under antitrust laws

(a) Notwithstanding any final judgment rendered in any action brought by the United States under which a joint operating arrangement has been held to be unlawful under any antitrust law, any party to such final judgment may reinstitute said joint newspaper operating arrangement to the extent permissible under section 1803(a) of this title.

(b) The provisions of section 1803 of this title shall apply to the determination of any civil or criminal action pending in any district court of the United State [sic] on July 24, 1970, in which it is alleged that any such joint operating agreement is unlawful under any antitrust law.

Matsunaga). JOAs accomplished Congress's goal because they allowed newspapers "to reduce costs by combining the economic and business aspects of newspaper production, and at the same time, permitted the newspaper participants to maintain separate editorial and reportorial staffs and independent editorial and news policies." *Id.*

The NPA provides that JOAs entered into prior to the law's passage will automatically receive antitrust immunity. 15 U.S.C. § 1803(a). Section 1803(a) shields joint operating agreements existing prior to July 24, 1970, "if at the time at which such arrangement was first entered into ... not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication." Newspapers that execute JOAs after the effective date of the NPA are required to obtain the consent of the Attorney General of the United States in order to receive the same immunity. 15 U.S.C. § 1803(b). The NPA also provides that JOA participants are not exempt from laws which prohibit certain practices that would be unlawful if committed by a single entity. 15 U.S.C. § 1803(c). The law reinstituted any JOA that had been declared unlawful under antitrust laws. 15 U.S.C. § 1804(a).

Hawaii has made several unsuccessful attempts to regulate or dismantle the Honolulu Advertiser and the Honolulu Star–Bulletin's JOA. In 1974 and 1979, members of the state legislature introduced legislation that would have regulated the JOA as a public utility. This proposed legislation did not pass. In addition, the city and county of Honolulu challenged the newspapers' exemption from federal antitrust laws in federal court proceedings. In *City and County of Honolulu v. Hawaii Newspaper Agency, Inc.,* 559 F.Supp. 1021 (D.Haw.1983), the district court granted the newspapers' motion for a directed verdict. The court held that the 1962 JOA was entitled to the protection of section 1803 because the evidence demonstrated that the Honolulu Advertiser was in "serious financial trouble" and that the Honolulu Advertiser's management had a "good faith belief" that joint action "was necessary in order to preserve the Advertiser's editorial staff as an editorial voice in the community separate and apart from that of the Star–Bulletin." *Id.* at 1032.

In 1995, the Hawaii Legislature passed Act 243.[2] In section 1 of Act 243, the Hawaii legislature stated "that the original justification for the monopoly granted by the public in 1962 may no longer be true." 1995 Haw. Sess. Laws, Act 243 § 1. The legislature also found "that it is in the public interest to review the income tax returns of organizations granted special operating powers to carry out its responsibilities to the people of Hawaii." *Id.* Act 243 requires the Honolulu Advertiser and the Honolulu Star–Bulletin to submit their income tax returns to the attorney general within thirty days after December 31 of the reporting year. Act 243 § 2–2(a). The statute also requires the Honolulu Advertiser and the Honolulu Star–Bulletin to furnish any "special or supplementary reports" that the attorney general "deems necessary or expedient." Act 243 § 2–2(b). Act 243 makes this information a public record. Act 243 § 2–2(c). Once the attorney general compiles this information, he or she must "submit an annual report to the United

---

**2.** Act 243 § 2 provides in pertinent part:

§ –1 General definitions. As used in this chapter:

"Media" means any printed publication of general distribution in the state issued once or more per year that is a party to the Mutual Publishing Plan Agreement as executed on May 31, 1962, and any subsequent amendments.

§ –2 Disclosure. (a) The media shall submit to the attorney general, no later than thirty days after December 31 of the reporting year, an income tax return filed pursuant to section 235–4.

(b) Any media filing an annual income tax return pursuant to subsection (a) shall also furnish to the attorney general, in forms and at times that the attorney general deems necessary or expedient in the interest of the general public, special or supplementary reports covering information disclosed in subsection (a).

(c) Any report submitted pursuant to subsection (a) or (b) shall be a public record for the purposes of chapter 92F.

§ –3 Annual report. The attorney general shall submit an annual report to the United States Department of Justice with regard to the information provided in section –2.

States Department of Justice." Act 243 § 2–3.

The Honolulu Advertiser, the Honolulu Star–Bulletin, and the HNA filed this action on August 3, 1995, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. In their complaint, the plaintiffs alleged that Act 243 was preempted by the NPA, violated the First Amendment, the Equal Protection Clause, the Due Process Clause, and was a bill of attainder. The newspapers moved for summary judgment on October 31, 1995 and the Hawaii Attorney General filed a cross-motion for summary judgment on November 9, 1995.

The district court granted the plaintiffs' motion for summary judgment on January 3, 1996. The court held that (1) the NPA preempted the State of Hawaii's attempt to regulate the JOA, (2) the plaintiffs presented a ripe First Amendment claim, (3) Act 243 violated the First Amendment, (4) Act 243 violated the Due Process Clause,[3] and (5) Act 243 was not a bill of attainder. Judgment was entered on January 11, 1996. Attorney General Bronster filed a timely notice of appeal on February 6, 1996.

## II.

■ The ripeness doctrine precludes federal courts from exercising their jurisdiction over an action that is filed before a real dispute exists between the parties. *Poe v. Ullman,* 367 U.S. 497, 507, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961); *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). Attorney General Bronster argues that the district court erred in concluding that the newspapers presented a ripe First Amendment claim. In their briefs before this court, however, neither party addressed whether the newspapers' preemption claim is ripe for review. Nevertheless, it is our duty to consider *sua sponte* whether the preemption issue is ripe, because "[t]he question of ripeness goes to our subject matter jurisdiction to hear the case." *Shelter Creek Development Corp. v. City of Oxnard,* 838 F.2d 375,

377 (9th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988); *see also Southern Pacific v. City of Los Angeles,* 922 F.2d 498, 502 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991) (holding that the ripeness issue "may be raised sua sponte if not raised by the parties"). In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court held that a claim's ripeness depended on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. Under the two-part test in *Abbott,* the newspapers' preemption claim is ripe for review.

First, the newspapers' preemption challenge is fit for judicial decision. "Legal questions that require little factual development are more likely to be ripe." *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434 (9th Cir.1996). In *Sayles Hydro Associates v. Maughan,* 985 F.2d 451 (9th Cir.1993), we held that the issue of whether a federal law " 'occupies the field' and thereby preempts state law is 'purely legal.' " *Id.* at 454. We are presented with a similar situation in this matter. We can decide the newspapers' claim without further factual development.

Second, the threat of hardship to the newspapers if the court withheld consideration in this situation is both " 'real and immediate,' not 'conjectural' or 'hypothetical.' " *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted). In fact, "the inevitability of the operation of [the] statute against certain individuals is patent." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). There can be no doubt that the Star–Bulletin and the Advertiser will violate the law if they do not comply with the Attorney General's request for financial information "no later than thirty days after December 31 of the reporting year." Act 243 § 2–2(a). Attorney General Bronster's argument in this matter clearly indicates her intention to enforce Act

---

**3.** Although the district court's order declares that Act 243 violates the Due Process Clause, Judge King analyzed the law under the Equal Protec-

tion Clause. Plaintiffs did not address the Due Process Clause in their brief before this court.

243 against the newspapers. Thus, the facts presented in this matter are clearly distinguishable from the circumstances in *Poe.* In that case, the Supreme Court determined that a constitutional challenge to Connecticut's contraceptives regulations was not ripe because there was no evidence that state officials intended to prosecute violators. *Poe,* 367 U.S. at 507–08, 81 S.Ct. at 1758–59. Here, the threat of enforcement is imminent.

In addition, compliance itself will cause a significant injury. Hawaii law makes it a crime for a public official to disclose a tax return or information related to that return. Haw.Rev.Stat. § 235–116 (1995).[4] As noted above, however, Act 243 provides that a newspaper's tax returns and accompanying financial data shall be a public record and directs the state attorney general to submit the information in an annual report to the United States Department of Justice. Act 243 §§ 2–2(c), 2–3. As a result, any interested party, including business competitors, can gain access to information concerning the newspapers' financial status which, but for Act 243, would be confidential.

The newspapers' failure to comply with Act 243 does not affect our conclusion that there is a ripe preemption claim. In *Sayles,* we held that a party presented a ripe preemption claim even though it had not completed a state permit process. 985 F.2d at 453–54. In that case, the federal government granted Sayles Hydro Associates a license under the Federal Power Act to construct and operate a hydroelectric power plant. The California State Water Resources Control Board, however, would not issue a permit to Sayles allowing it to begin its operation. Instead, the state requested "a shifting, expanding range of reports and studies" regarding the project's environmental impacts. *Id.* at 453. Sayles refused to conduct additional studies and challenged the law on federal preemption grounds. We concluded that Sayles's preemption claim was ripe even though Sayles had not fully complied with the state requirements. *Id.* at 454. We held that Sayles's preemption claim was fit for judicial decision because it was a "purely legal" question. *Id.* We also determined that withholding judicial consideration of the state requirements would impose a sufficient hardship on Sayles because of the costs and uncertainty resulting from "undue process." *Id.* The hardship did not result from the state's denial of a permit. Rather, we concluded that "[t]he hardship is the process itself." *Id.*

Our reasoning in *Sayles* applies with equal force to the circumstances present in this case. If the newspapers must comply with Act 243 before they can mount a constitutional challenge, they will have already suffered an irreparable injury from the "undue process" of having to produce the requested information and the public disclosure of their financial records.

There is no doubt that Hawaii's Attorney General will seek to enforce the requirements of Act 243 against the Hawaii Newspaper Agency. Not only will this law saddle the plaintiffs with a burden applicable solely to the Honolulu Advertiser and the Honolulu Star–Bulletin, it will also force them to reveal confidential financial information to the public. Due to the threat of imminent enforcement and the serious injury that would flow from compliance, the newspapers' only two options were to bring this action or break the law. These circumstances demonstrate that the plaintiffs' preemption claim is ripe.

---

4. Section 235–116 provides:

All tax returns and return information required to be filed under this chapter shall be confidential, including any copy of any portion of a federal return which may be attached to a state tax return, or any information reflected in the copy of such federal return. It shall be unlawful for any person, or any officer or employee of the State to make known intentionally information imparted by any income tax return or estimate made under sections 235–92, 235–94, 235–95, and 235–97 or wilfully to permit any income tax return or estimate so made or copy thereof to be seen or examined by any person other than the taxpayer or the taxpayer's authorized agent, persons duly authorized by the State in connection with their official duties, the Multistate Tax Commission or the authorized representative thereof, except as provided by law, and any offense against the foregoing provisions shall be punished by a fine not exceeding $500 or by imprisonment not exceeding one year, or both.

### III.

Under the Supremacy Clause of the United States Constitution, federal law is the supreme law of the land. U.S. Const. art. VI, cl. 2. A state law is preempted when (1) Congress has expressly superseded state law, (2) Congress has regulated a field so extensively that a reasonable person would infer that Congress intended to supersede state law, and (3) when there is a conflict between federal and state laws. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). In passing the NPA, Congress did not expressly preempt state law. As we explain below, we agree with the district court that Act 243 violated the Supremacy Clause because Congress preempted the field in enacting the NPA. We review *de novo* a district court's application of the doctrine of preemption. *Inland Empire Chapter of Associated Gen. Contractors v. Dear*, 77 F.3d 296, 299 (9th Cir.1996).

We must decide whether Congress intended to preempt any state laws regulating JOAs. Attorney General Bronster argues that "the scheme of federal regulation under the NPA is not so pervasive as to make reasonable the inference that Congress left no room for supplemental regulation." Defendant–Appellant's Opening Brief at 11. Rather, she contends that the NPA merely preempts state laws that directly remove or modify the newspapers' antitrust immunity. The newspapers' maintain that the NPA is a "complete strategy for validating newspaper joint operating agreements." Appellees' Brief at 16. Accordingly, the newspapers assert that the NPA precludes all state attempts to regulate newspapers due to their involvement in a JOA. To determine the preemptive effect, if any, of the NPA, we must look to congressional intent. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1901–10, 85 L.Ed.2d 206 (1985).

Three factors illustrate Congress's intention to preempt any state regulation that is based on a newspaper's involvement in a JOA. First, in exempting participants to a JOA from the reach of antitrust laws, Congress adopted a comprehensive solution to the problems facing newspapers struggling to survive economically. The NPA sets forth each of the requirements that JOA participants must satisfy in order to receive antitrust immunity. 15 U.S.C. § 1803(a)-(b). Once a JOA application satisfies the threshold requirements, "nothing more is required; nothing in the statute or its history indicates otherwise." *Committee for an Independent P–I v. Smith*, 549 F.Supp. 985, 994 (W.D.Wash.1982), *aff'd in part and rev'd in part*, 704 F.2d 467 (9th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983). The NPA contains no temporal limitation. The NPA does not require that JOA participants disclose their financial information, or authorize the Attorney General of the United States to oversee participants' finances in order to determine whether a JOA is still necessary. The only post-formation requirement in the NPA is that parties to pre-existing JOAs must submit to the Department of Justice the terms of any agreement that would renew or amend their arrangement. 15 U.S.C. § 1803(a). The NPA's language makes clear that the nature of a newspaper's financial status following formation of a JOA is irrelevant to a JOA's antitrust immunity. The text of the NPA is simple and direct, yet pervasive. The statute's plain language leaves nothing for states to regulate. By exempting JOAs from any additional requirements that would limit a newspaper's antitrust immunity for entering into a JOA, we can infer that Congress did not intend that a state could pass laws imposing separate conditions on newspapers that receive antitrust immunity because they have entered into a JOA.

Second, Congress found that participation in JOAs without antitrust regulation was necessary to ensure that there was more than one newspaper in a community. Congress recognized that it had become nearly impossible for more than one newspaper to survive in any major market due to a variety of economic factors unique to the newspaper industry. *See* S.Rep. No. 535 at 4, 91st Cong., 1st Sess. (1969); *Committee for an Independent P–I v. Hearst Corp.*, 704 F.2d 467, 473–74 (9th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983).

These unique economic conditions "necessitated allowing newspapers to enter joint agreements before they reached the point of distress required by *Citizen Publishing.*" *Id.* at 474. Congress chose this strategy because it had proven to be effective in the past at maintaining separate editorial voices in markets unable to support more than one paper. H.R.Rep. No. 91–1193 at 3, *reprinted in* 1970 U.S.C.C.A.N. at 3548. A state's imposition of burdensome conditions on JOA participants, including requiring disclosure of financial records to competitors, would frustrate Congress's intent to ensure the economic survival of newspapers and guarantee the expression of conflicting views on social and political issues. Congress's comprehensive solution to the unique economic problems which threatened many newspapers' survival demonstrates that Congress intended JOAs to remain unregulated even after participating newspapers again operate profitably.

Finally, Congress further indicated an intent to preempt supplemental state regulation of JOAs by expressly enumerating the types of state laws that can be applied to JOAs. Section 1803(c) withholds antitrust immunity from "predatory pricing, any predatory practice, or any other conduct" that would be unlawful if committed by a "single entity." Thus, except for laws controlling these prohibited activities, a state may not enact statutes that regulate a newspaper solely because of its participation in a JOA. Given the NPA's comprehensive scheme, a reasonable person could infer that Congress intended that state regulation of JOAs be limited to the exemptions listed in section 1803(c).[5]

We hold that Congress has preempted the field of regulations that are based on a newspaper's involvement in a JOA. Congress has set forth all the conditions governing their formation and qualification for antitrust immunity. Both the statute's language and its legislative history indicate that Congress intended its regulation of newspapers in JOAs

to be exclusive. Congress expressly reserved a field of permissible state regulation in section 1803(c). The NPA's language and structure precludes states from directly or indirectly regulating a newspaper's participation in a JOA unless the conduct of a newspaper comes within these specific exceptions.

We next consider whether Act 243 falls within the preempted field. "When the federal government completely occupies a given field or an identifiable portion of it, ... the test of preemption is whether 'the matter on which the state asserts the right to act is in anyway regulated by the Federal Act.'" *Pacific Gas & Elec. Co. v. State Energy Comm'n,* 461 U.S. 190, 212–13, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983) (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947)). In her opening brief, Attorney General Bronster characterizes Act 243 as a "supplemental regulation" to the NPA. Defendant–Appellant's Opening Brief at 11. Although Act 243 does not expressly remove or modify the newspapers' antitrust immunity, it requires the Star–Bulletin and the Advertiser to release their financial records to the public solely because they are operating under a JOA. Act 243 §§ 2–1, 2–2(a)–(c). Thus, Act 243 is unquestionably a state regulation of newspapers because they have entered into a JOA. Because Act 243 thus intrudes upon a field preempted by Congress, the Act is preempted by the NPA.

Our conclusion that the NPA preempts Act 243 is strengthened by the fact that Congress expressly considered Hawaii's primary interest in protecting the public from a JOA's harmful anticompetitive effects. *See Sayles,* 985 F.2d at 456 (conclusion of field preemption "strengthened" where federal government addressed and took steps to protect state interests). Although Congress knew that the NPA would affect competition, "[i]t believed those possibly harmful effects were outweighed by other considerations and suffi-

---

5. Hawaii correctly notes that the NPA does not preempt generally applicable laws that may have a negative financial impact on parties to a JOA, such as corporate taxes, utility rates, or minimum wage laws. Appellant's Opening Brief at

19. Act 243, however, is not a generally applicable law. A determination that Act 243 is preempted will have no effect on the application of general laws to the newspapers.

ciently alleviated by the requirements of the Act." *Independent P–I,* 704 F.2d at 482. Section 1803(c) reflects Congress's consideration of concerns such as those expressed in Act 243. This section's purpose was "to protect the competitive position of newspapers which share the market with a joint operating arrangement." S.Rep. No. 535 at 5, *quoted in Independent P–I,* 704 F.2d at 481. Having considered the NPA's potentially harmful effects, Congress made a rational policy choice in favor of "the more important obj[e]ctive of preserving separate editorial voices." H.R.Rep. No. 91–1193 at 4, *reprinted in* 1970 U.S.C.C.A.N. at 3549 (quoting remarks of Rep. Matsunaga). The field preemption doctrine prevents Hawaii from interfering with this congressional policy through legislative regulation of a newspaper's involvement in a JOA.

Attorney General Bronster argues that the district court's decision will prevent states from gathering information that can be used to lobby Congress to make changes in the NPA or remove the antitrust exemption in specific markets. Under the NPA, however, Congress does not need special state laws to assist it in discovering whether the NPA should be amended to exclude newspapers that are financially sound and no longer need antitrust immunity. Prior to the enactment of the NPA, Congress collected financial information from participants in pre-existing JOAs in part to assess their financial condition when they entered into the JOA. H.R.Rep. No. 91–1193 at 8–9, *reprinted in* 1970 U.S.C.C.A.N at 3552–53. Newspapers who now seek approval of a new JOA must submit relevant financial data to the Attorney General of the United States. If Congress desires more information, it can order the newspapers to disclose it.

Hawaii is free to request Congress to order newspapers to submit financial data to determine whether the NPA should be amended or repealed. Since Congress has preempted any attempt by a state to regulate a newspaper's participation in a JOA, Hawaii cannot impose discriminatory burdens on such newspapers for the purpose of gathering information for legislative reform by Congress.

Because field preemption alone is a sufficient basis to hold that Act 243 is invalid, we do not consider the validity of the newspapers' remaining constitutional claims.

AFFIRMED.