State of HAWAII, by Earl I. ANZAI, Attorney General, State of Hawaii

v.

GANNETT PACIFIC CORP., et al.

No. 99–687 ACK–BMK.

United States District Court, D. Hawaii.

Oct. 15, 1999.

Rodney I. Kimura, Office of Atty. General—State of Hawaii, Honolulu, HI, for State of Hawaii.

John R. Lacy and Lisa W. Munger of Goodsill, Anderson, Quinn & Stifel, Honolulu, HI, Robert C. Bernius, John S. Smith, Gordon L. Lang, Nixon Hargrave Devans & Doyle, Washington, DC, for Gannett Pacific Corp.

Anna H. Oshiro, Damon Key Bocken Leong & Kupchak, Honolulu, HI, Alan L. Marx, King & Barlow, Nashville, TN, for Liberty Newspapers Ltd.

John R. Lacy and Lisa W. Munger of Goodsill, Anderson, Quinn & Stifel, Honolulu, HI, for Hawaii Newspaper Agency.

Kirks Van Essen & Murray, Santa Fe, NM, pro se.

### ORDER GRANTING THE STATE'S MOTION FOR A PRELIMINARY INJUNCTION

KAY, District Judge.

### SYNOPSIS

This case presents a difficult, close call on an issue of first impression under the Newspaper Preservation Act. It is not a typical free enterprise situation where the owner of a business wishes to close it. Here, Defendants have availed themselves of exemptions under the Newspaper Preservation Act and have been allowed to operate under a Joint Operating Agreement ("JOA") which, but for the Newspaper Preservation Act, would have violated the antitrust laws from its inception. After carefully weighing the various factors, the Court will GRANT the State's motion for a preliminary injunction.

The Court finds that the State has demonstrated a likelihood of success on the merits. In reaching this conclusion, the Court notes that it is not convinced by Defendants' arguments that the Newspaper Preservation Act exempts the Amendment and Termination Agreement ("Termination Agreement") from antitrust scrutiny. The stated purpose of the Act is to preserve newspapers, yet the current Termination Agreement would inevitably result in the closure of the Star–Bulletin

because, without the benefit of the JOA, it lacks the infrastructure necessary to continue publishing the newspaper. Thus, because Defendants' actions contravene the purpose of the Newspaper Preservation Act and, in effect, will lead to the closure of the Star–Bulletin, the Court finds that Defendants do not enjoy the antitrust exemptions otherwise available to them under the Act.

The existing JOA pays Liberty a guaranteed annual return ranging from 12% in 1999 to 17% in 2012 on its initial $15 million investment in 1993. Under the Termination Agreement, GPC would pay Liberty what Liberty would otherwise receive as guaranteed payments over the next thirteen years–but without Liberty having to publish the Star–Bulletin. In effect, GPC would be buying out the Star–Bulletin. This would result in the elimination of any competition to the Advertiser in this unique island community. In this regard, the Court notes that GPC's parent company (or subsidiary) first purchased the Star–Bulletin when it was the healthier of the two local newspapers operating under the JOA and then in 1993 purchased the Advertiser because at that point in time it apparently had a more promising future. It then sold the Star–Bulletin to Liberty after first stripping the Star–Bulletin of its operating equipment and assets. There evidently has been no effort by Liberty to sell the Star–Bulletin as a going concern.

The Court also finds that Defendants' First Amendment rights are not implicated by the current preliminary injunction requiring the parties to maintain the status quo. In this regard, the Court finds the Supreme Court's decision in *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), particularly instructive. In that case, the Supreme Court held that:

> The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That

Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.

*Associated Press*, 326 U.S. at 20, 65 S.Ct. 1416. Thus, the Court finds that Defendants' First Amendment arguments do not shield them from antitrust scrutiny.

Moreover, the Court finds that the State has demonstrated a strong possibility of irreparable harm if the Termination Agreement is not enjoined and that the balance of hardships tilts sharply in favor of the State. Once the Star–Bulletin has been shut down it will be virtually impossible to reopen. The Court finds that Liberty will not suffer any serious economic loss because Liberty will continue to profit by the receipt of its guaranteed annual return under the JOA. Although GPC may lose money due to the Star–Bulletin's operating losses, Defendants did not present any evidence that GPC and HNA are not profitable overall. Thus, the Court finds that the balance of hardships sharply tilts in favor of the State.

Finally, the Court finds that the public interest weighs in favor of granting injunctive relief because of the pending shutdown of the Star–Bulletin and the concomitant loss of independent editorial and reportorial voices, as well as the loss of over 100 jobs and the loss of competition for advertisers and creators of news,

editorial, and entertainment content. Taking all these factors into consideration, the Court finds it appropriate to issue a preliminary injunction.

## BACKGROUND

On October 6, 1999, Plaintiff State of Hawaii (the "State") filed a complaint in federal court seeking to challenge the implementation of an agreement by Defendants Gannett Pacific Corporation ("GPC"),[1] which owns the Honolulu Advertiser (the "Advertiser"), Liberty Newspapers Limited Partnership ("Liberty"), which owns the Honolulu Star–Bulletin (the "Star–Bulletin"), and the Hawaii Newspaper Agency, a Delaware limited partnership (collectively "Defendants"), to terminate the JOA and the resultant shutdown of the Star–Bulletin. The State contends that the closure of the Star–Bulletin under these circumstances violates the Sherman Act, 15 U.S.C. §§ 1, 2, and state antitrust laws, H.R.S. § 480–1 et seq. In the instant motion, the State seeks a preliminary injunction[2] to enjoin Defendants from taking any further steps to implement the Termination Agreement and close the Star–Bulletin, with the last announced date of publication being October 30, 1999.[3]

The Ninth Circuit recently summarized the origins of the present Joint Operating Agreement (JOA), which Defendants now seek to terminate.

In 1962, the Advertiser was experiencing financial difficulty and was on the verge of failure. In order to prevent the newspaper's demise and preserve its editorial voice, the Advertiser entered into a Joint Operating Agreement ("JOA") with the Star Bulletin on May 31, 1962. Under the JOA, the newspapers merged their commercial, circulation, and advertising departments, but maintained separate and independent editorial voices. The newspapers formed the Hawaii Newspaper Agency to carry out the JOA.

*Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 744 (9th Cir.1996). At the time that the original JOA was entered into, GPC owned the Star–Bulletin, not the Advertiser. Sometime prior to January 30, 1993, GPC's parent (or subsidiary) stripped the Star–Bulletin of its operating equipment and assets by transferring them to the Advertiser. GPC's parent (or subsidiary) then sold its interest in the Star–Bulletin to Liberty and purchased the Advertiser. *See* State's Motion, Oct. 8, 1999, Exh. A, at 2.

In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), which held that a JOA between two newspapers in Tucson, Arizona violated federal antitrust laws because neither newspaper could demonstrate that it was a "failing company," Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801–1804. As summarized by the Ninth Circuit:

Congress explained that JOAs were necessary to maintain "a newspaper press editorially and reportorially independent and competitive in all parts of the United States." Congress found

---

**1.** GPC was formerly known as Honolulu Advertiser, Inc. and Gannett Pacific Newspapers, Inc.

**2.** The State originally sought a temporary restraining order. However, the parties agreed at the hearing to convert the State's motion to a motion for a preliminary injunction.

**3.** The Court observes that the State recently sought to eliminate the JOA when the legislature found that "the original justification for the monopoly granted by the public in 1962 may no longer be true," and ordered the Advertiser and Star–Bulletin to disclose their financial records to the state attorney general. *See Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir.1996). The Ninth Circuit held that Congress' passage of the Newspaper Preservation Act preempted the field. *See generally Hawaii Newspaper Agency Ltd. Partnership v. Bronster*, 1996 U.S. Dist. LEXIS 1082 (D. Haw.1996); *City and County of Honolulu v. Hawaii Newspaper Agency, Inc.*, 559 F.Supp. 1021 (D.Haw.1983).

that "economic conditions have created a situation in which a large majority of American communities have already become one owner newspaper communities." JOAs accomplished Congress's goal because they allowed newspapers "to reduce costs by combining the economic and business aspects of newspaper production, and at the same time, permitted the newspaper participants to maintain separate editorial and reportorial staffs and independent editorial and news policies."

*Hawaii Newspaper Agency,* 103 F.3d at 744–45 (citations omitted).[4]

The most recent amendment to the JOA between the Advertiser and the Star–Bulletin was entered into on January 30, 1993 and had a twenty-year term (until the last Sunday in December, 2012) with subsequent five-year extensions unless either party elected to cancel the JOA. It provides two sources of income for Liberty: a guaranteed annual return and a percentage of excess profits. *See* State's Motion, Oct. 8, 1999, Exh. A, at 23–25(JOA). Specifically, the amount of guaranteed annual return for the remainder of the JOA exceeds $28 million. The JOA also provides that the Star–Bulletin shall receive 3% of any special profits, although none have been realized to date.

The instant case stems from Defendants' decision to terminate the current JOA as of October 30, 1999 and Liberty's decision to cease publishing the Star–Bulletin as of October 30, 1999. Both of these decisions, which were necessarily integrated, were announced on September 16, 1999. Since that time, no effort has been made by Liberty to sell the Star–Bulletin as a going concern.[5] Under the Termination Agreement, which was signed on September 7, 1999, Liberty has agreed to an early termination of the JOA in exchange for receiving an up-front payment of $26.5 million from GPC.[6]

---

4. Section 1803 of the Newspaper Preservation Act provides:

(a) It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: *Provided,* That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.

(b) It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior or to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

(c) Nothing contained in the chapter shall be construed to exempt from any antitrust law any predatory pricing, any predatory practice, or any other conduct in the otherwise lawful operations of a joint newspaper operating arrangement which would be unlawful under any antitrust law if engaged in by a single entity. Except as provided in this chapter, no joint newspaper operating arrangement or any party thereto shall be exempt from any antitrust law.

15 U.S.C. § 1803.

5. The Court also observes that the JOA provides that the Star–Bulletin must obtain the consent of the Advertiser before it can assign its interest in the JOA partnership or any controlling interest of its capital stock, and that the Advertiser's consent must not be unreasonably withheld. However, the Advertiser is not required to obtain the consent of the Star–Bulletin prior to taking the same actions. *See* State's Motion, Oct. 8, 1999, Exh. A, at 36–37.

6. Under the terms of the 1993 amendment to the JOA, if Liberty ceased publishing the Star–Bulletin, Liberty would not be entitled to receive the guaranteed annual profits. Instead, Liberty would receive the Star–Bulletin's name, its advertiser and subscriber lists, and $100. All other assets, including the printing and distributing infrastructure, would go to the Advertiser. *See* State's Motion, Oct. 8, 1999, Exh. A, at 31–32.

According to an affidavit given by Wayne Cahill, the administrative officer of the Hawaii Newspaper Guild, he attended a meeting with the owner of Liberty, Rupert Phillips, and questioned him about the shutdown decision. At that meeting, Phillips stated that he was shutting down the Star–Bulletin not because it was losing money, but because he was not making as much profit as other comparable newspapers and wanted to invest his money elsewhere. Cahill also avers that Phillips told him that he had signed an agreement with GPC whereby GPC would pay him the guaranteed annual profit for the remaining years of the JOA. *See* State's Motion, Oct. 8, 1999, Declaration of Wayne E. Cahill.

Since the announcement that the Star–Bulletin would cease publication on October 30, 1999, the State maintains that Defendants have undertaken actions that, unless halted immediately, will result in the economic demise of the Star–Bulletin. Namely, the State argues that Defendants have taken steps to impair the circulation of the Star–Bulletin by mailing letters to current subscribers and calling current subscribers to inform them that their subscription will be converted over to the Advertiser on November 1, 1999 and that they can call to request a refund. *See* State's Motion, Oct. 8, 1999, at Exh. B. The State also claims that Defendants are destroying the relationship between the Star–Bulletin and its advertisers by mailing letters to advertisers that will cause advertisers to seek alternative advertising mediums. Finally, the State maintains that Defendants are impairing public access to the Star–Bulletin by removing Star–Bulletin street vending racks so that they can be repainted and reused by the Advertiser.

In response to the State's October 8, 1999 motion, Defendants filed their opposition on October 12, 1999. The Court also considered GPC's memorandum attached to its Motion to Dismiss, which was filed on October 11, 1999, although that particular motion will be heard at a later date.

On October 12, 1999, the State filed additional documents in support of its motion for a preliminary injunction. The Court held a hearing on October 13, 1999.

### *Standard of Review*

■ The standards for granting a temporary restraining order and a preliminary injunction are identical. In *Miller v. California Pacific Medical Ctr.,* 19 F.3d 449 (9th Cir.1994), the Ninth Circuit set forth the standard for granting a preliminary injunction as follows:

> Traditionally we consider (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

*Id.* at 456 (citing *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987)).

> The moving party must show 'either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.'

*Miller,* 19 F.3d at 456 (quoting *Senate of California v. Mosbacher,* 968 F.2d 974, 977 (9th Cir.1992)). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* at 456. These formulations are not discrete tests, but the extremes of a single continuum. *See Los Angeles Memorial Coliseum Comm. v. National Football League,* 634 F.2d 1197, 1201. Accordingly, "[i]f the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly."

*State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir.1988). At an irreducible minimum, however, the plaintiff must demonstrate a fair chance of success on the merits or questions serious enough to require litigation. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). Moreover, under any formulation of the test, the plaintiff must demonstrate a significant threat of irreparable injury. *Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir.1985).

■ The grant or denial of a temporary restraining order is reviewed for abuse of discretion. *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1132–33 (9th Cir. 1979).

## DISCUSSION

The State argues that a preliminary injunction must be issued to preserve the status quo pending a final decision in this case. After carefully considering the arguments of both parties, the Court agrees and finds that it is appropriate to issue a preliminary injunction.

## I LIKELIHOOD OF SUCCESS ON THE MERITS.

First, the Court finds that the State has demonstrated a likelihood of success on the merits. The State's complaint alleges three violations of the Sherman Act–restraint of trade, conspiracy to monopolize, and attempted monopolization–and three similar violations of state antitrust laws. The Court will address each of the federal claims in turn.[7]

## A. RESTRAINT OF TRADE.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. In order to establish a violation of Section 1 of the Sherman Act, the State must establish (1) the existence of an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of competition; and (3) an effect on interstate commerce. *See American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir.1996).

■ The Court agrees with the State that it is likely to prove these factors. The State is likely to establish the first and third factors fairly easily. As to the first factor, both GPC and Liberty have entered into the Termination Agreement whereby GPC has agreed to pay Liberty $26.5 million (apparently the discounted present value of the guaranteed annual profit called for in the JOA). In all likelihood, this constitutes the necessary agreement. With regard to the third factor, the Court finds that the State is likely to prove that the publication, printing, and distribution of daily newspapers in general circulation constitutes and affects interstate trade and commerce. Specifically, both the Advertiser and the Star–Bulletin purchase newsprint and news content in interstate commerce and regularly use interstate wire and mail communications to operate their businesses.

As to the second factor, the Court finds that the State is likely to prove that the agreement constitutes an unreasonable restraint of competition. The editorial and reportorial competition between the Star–Bulletin and the Advertiser has been in-

7. The Court need not address the state law claims separately because they essentially mirror the federal claims, *see, e.g., Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 91 Hawai'i 224, 247, 982 P.2d 853 (1999) (noting that the legislature followed the "federal paradigm" in fashioning Hawaii antitrust law and that the language of H.R.S. § 480–4 and § 480–9 traces the language of Section 1 and Section 2 of the Sherman Act). The Court notes that if the federal claims lack merit, then the state law claims would be preempted by the Newspaper Preservation Act. *See Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir.1996). However, the Court notes that daily newspapers are commodities within the meaning of H.R.S. § 480–1.

strumental in giving subscribers alternate news sources. The Court finds that the Termination Agreement, although it does not expressly require the closure of the Star–Bulletin, will lead to this outcome because the Star–Bulletin will not have access to the necessary infrastructure (currently held by the Hawaii Newspaper Agency and to be distributed to the Advertiser upon termination of the JOA) to continue publishing. Indeed, the interrelated decision by Liberty to terminate the JOA and cease publishing was announced simultaneously. Thus, the Advertiser will be the sole local newspaper and competition in this unique island community situate in the middle of the Pacific Ocean will be eliminated. The Star–Bulletin and the Advertiser are by far the two largest daily newspapers published in the relevant market of the state of Hawaii. There will be no competition to attract advertisers and creators of news, editorial, and entertainment content.

There appears to be no lawful justification for GPC to, in essence, buy out Liberty's interest in the JOA so that the JOA may be terminated thirteen years before its scheduled expiration date (and only six years after its inception).[8] In reaching this conclusion, the Court emphasizes that the intent of the Newspaper Preservation Act is to preserve the publication of newspapers and that the proposed Termination Agreement has the effect of paying the Star–Bulletin not to publish for the remaining thirteen years, as called for by the JOA. The Court notes that the stated purpose and intent of both parties to the JOA is to produce high quality newspapers, improve acceptance for their advertisers, subserve public interest by maintaining the separate identities, individuality and editorial and news freedom and integrity of the Star–Bulletin and the Advertiser. Moreover, the JOA further requires the Advertiser, as the general partner, to act "in a manner which it believes, in the good faith exercise of business judgment, is in the best interest of the overall economic performance of the Partnership and the Newspapers considered together...." State's Motion, Oct. 8, 1999, Exh. A, at 9. For these reasons, the Court finds that the State is likely to establish an unreasonable restraint of competition.

Defendants argue that there can be no antitrust violation because there is no economic competition at all in light of the Newspaper Preservation Act's antitrust exemptions. The Court recognizes that the Advertiser and Star–Bulletin operate to some extent as a single economic entity under the JOA. However, as discussed below, these actions receive antitrust exemption only so long as they are taken to preserve the independent editorial and reportorial voices of competing newspapers. In the instant case, the Termination Agreement contravenes the stated purpose of the Newspaper Preservation Act because it will lead to the shutdown of the Star–Bulletin thirteen years sooner than otherwise would have occurred while, at the same time, the parties to the agreement will be put in the same position as though the JOA ran until 2012 and GPC will, in effect, have bought out its only competitor in this unique island community.

The Court is not persuaded by Defendants' argument that the instant Termination Agreement involves some "non-economic social goal" rather than trade or commerce. See Opposition, Oct. 11, 1999, at 8. The Court recognizes that "trade or commerce" within the meaning of the antitrust laws generally comprises "commercial competition in the marketing of goods and services." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). This Court finds that this case falls within the definition of trade or commerce:

Newspaper Preservation Act "contains no temporal limitation."

---

**8.** The Court recognizes that the Ninth Circuit held in *Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 748 (9th Cir.1996), that the

[The purpose of the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices *or otherwise control the market to the detriment of purchasers or consumers of goods and services,* all of which had come to be regarded as a special form of public injury.

*Apex Hosiery,* 310 U.S. at 493, 60 S.Ct. 982 (emphasis added). The Court emphasizes that, if implemented, the Termination Agreement would deprive newspaper readers of free and open competition in the sale of daily newspapers and their differing editorial and reportorial voices, deprive advertisers of free and open competition in the market for the differentiated advertising audiences represented by the Advertiser and the Star–Bulletin, and would deprive creators of news, editorial, and entertainment content of free and open competition for their output. Thus, the Court concludes that the Termination Agreement is not protected by the Newspaper Preservation Act and, therefore, Defendants' actions can be subject to antitrust scrutiny on this limited basis.

### B. CONSPIRACY TO MONOPOLIZE.

■ The Court also finds that the State is likely to succeed in proving that Defendants have conspired to monopolize in violation of Section 2 of the Sherman Act. To establish this claim, the State must prove (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize. *See American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). As with the Section 1 claim previously discussed, the Court finds that the State is likely to establish the necessary elements in support of its claim. First, the Termination Agreement is likely to constitute the necessary combination or conspiracy. Second, the announcement of the closure of the Star–Bulletin, the notices to subscrib-

ers and advertisers, and the removal of the street vending racks constitute the requisite overt acts in furtherance of the conspiracy. Third, the Court finds that the State is likely to prove that Defendants' actions demonstrate a specific intent to monopolize. Although the form of the transaction is couched as an amendment to the existing JOA (which is expressly permitted by the Newspaper Preservation Act), the Court finds that the State has presented a strong argument that the intent of the agreement is for GPC to buy out Liberty so that Liberty may then shut down the Star–Bulletin while still preserving the profits guaranteed to it under the JOA and GPC would be left without a competitor in this unique island community.

### C. ATTEMPTED MONOPOLIZATION.

■ Finally, the Court finds that the State is likely to succeed in proving its claim of attempted monopolization. To establish a claim for attempt to monopolize, a plaintiff must prove: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *See Movie 1 & 2 v. United Artists Communications, Inc.,* 909 F.2d 1245, 1254 (9th Cir.1990) (citing *Transamerica Computer Co., Inc. v. International Business Machines,* 698 F.2d 1377 (9th Cir.1983)).

■ The Court finds that the State is likely to establish the requisite elements. First, as discussed above, the requisite intent may be established by Defendants' actions. Second, the anticompetitive conduct is likely to be demonstrated by the fact that GPC is paying Liberty $26.5 million up-front, an amount that approximates the amount of money it would be required to pay Liberty for the life of the JOA, in order to terminate the JOA now rather than in 2012. Although Liberty is not

required to cease publishing the Star–Bulletin, the closure of the Star–Bulletin will be virtually assured because it lacks the necessary infrastructure to continue publishing. The Court emphasizes that the decisions to terminate the JOA and to cease publishing the Star–Bulletin were integral to one another and were announced simultaneously. As stated earlier, this essentially constitutes a buyout of its sole competitor by GPC. Moreover, the Court recognizes that, in light of the fact that the Star–Bulletin was stripped of its operating equipment and assets in 1993 when it was owned by GPC's parent company (or subsidiary), it is unlikely to be a viable competitor if and when the JOA is terminated. Therefore, the Court finds that the State is likely to prove that this buyout constitutes anticompetitive conduct.

Third, the Court finds that the State will most likely be able to prove that, unless this agreement is enjoined, there is a dangerous probability that GPC will acquire monopoly power. As previously discussed, it appears with near certainty that the Star–Bulletin will have to shut down if the JOA is terminated. Fourth, the Court finds that this outcome would result in antitrust injury because no other daily newspaper would be published on Oahu, a unique island community, to compete with the Advertiser. In addition, there would be the concomitant loss of competition for advertisers and creators of news, editorial, and entertainment content. The Court notes that GPC's parent company (or subsidiary) first purchased the Star–Bulletin when it was the healthier of the two local newspapers operating under the JOA and then in 1993 purchased the Advertiser because at that point in time it apparently had a more promising future. It then sold the Star–Bulletin to Liberty after first stripping the Star–Bulletin of its operating equipment and assets.

### D. *APPLICABILITY OF THE NEWSPAPER PRESERVATION ACT.*

Defendants argue that the Newspaper Preservation Act exempts the Termination Agreement from antitrust laws. Although superficially appealing, the Court finds this argument ultimately unpersuasive. The Court recognizes that the JOA is exempt from antitrust laws, and that the Newspaper Preservation Act expressly permits the parties to amend an existing JOA simply by filing the amendment with the Department of Justice so long as the amendment does not add a newspaper to the existing JOA. Thus, Defendants reason, they are exempt from antitrust laws and should not be enjoined from amending the JOA.

■ The Court finds that Defendants' arguments lose force when the purpose of the Act–to preserve independent editorial and reportorial voices–is considered. The statute expressly states that it is the "public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into . . . ." 15 U.S.C. § 1801. The Court finds that if Defendants are permitted to consummate the Termination Agreement as it now stands, the practical result would be that GPC would pay up-front to Liberty $26.5 million for the right to terminate the JOA thirteen years early–without Liberty having to publish the Star–Bulletin for the next thirteen years. The Court is not persuaded by Defendants' arguments that the Termination Agreement actually increases competition. The Court recognizes that the terms of the agreement do not preclude Liberty, or anyone else, from publishing the Star–Bulletin. However, the Court will not close its eyes to the practical effect of the agreement because the Star–Bulletin, which lacks the infrastructure to continue publishing the newspaper, would inevitably close. In fact, as discussed above, this decision was announced simultaneously with the interrelated decision to terminate the JOA and Liberty has made no effort to sell the Star–Bulletin as a going concern.

The Court finds that it does have the power to enjoin the instant Termination Agreement. Any other outcome would be completely at odds with the congressional intent embodied in the Newspaper Preservation Act. The Court emphasizes that Defendants were not compelled to extend the JOA until 2012; yet having done so, and having benefited from the antitrust exemptions created by the Newspaper Preservation Act, Defendants now propose that one party, in effect, buy out another while the public interest is deprived of an additional thirteen years of competing, independent editorial and reportorial voices, with the Star–Bulletin left in a denuded, inoperable condition.

### E.  *FIRST AMENDMENT CLAIMS.*

■ Defendants also claim that any injunctive relief will necessarily violate their First Amendment rights to refrain from speaking or publishing. The Court finds the Supreme Court's decision in *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), particularly instructive. In *Associated Press*, the Government sought to enjoin members of the Associated Press from prohibiting its members from selling news to non-members and granting each member powers to block its non-member competitors from membership. The Supreme Court affirmed an injunction issued by a three-judge panel. In doing so, the Supreme Court rejected the argument that the press is immune from the antitrust laws by virtue of the First Amendment, stating:

> The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.

*Associated Press,* 326 U.S. at 20, 65 S.Ct. 1416. Thus, if the Court is correct that the State is likely to prove that Defendants have violated antitrust laws and that the Newspaper Preservation Act does not otherwise exempt them from antitrust scrutiny, then the Supreme Court's decision in *Associated Press* makes it clear that there is no First Amendment violation.

In support of their argument that the First Amendment precludes injunctive relief, Defendants cite *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (holding that the First Amendment prohibited Delaware from requiring its citizens to advertise the motto "Live Free or Die" on automobile license plates), and *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (holding that Florida right-of-reply statute violated the First Amendment because it compelled newspaper editors or publishers to publish that which reason tells them should not be published and that this was a penalty based on the content of the newspaper). The Court finds this argument unpersuasive for several reasons.

First, the Court finds that these cases are distinguishable because here the Court is not compelling Defendants to publish any particular viewpoint. In *Wooley,* the Plaintiffs were compelled to advertise the motto "Live Free or Die" on their license plates, and in *Tornillo* the plaintiff was compelled to publish any reply by a political candidate to editorials criticizing that candidate. Conversely, here the Court

would merely enjoin Defendants to continue doing that which they are already doing under the terms of the JOA, namely publishing a newspaper with whatever editorial and reportorial content they deem appropriate. In reaching this conclusion, the Court notes that the Supreme Court addressed a similar claim in *Associated Press:*

> It is argued that the decree interferes with freedom 'to print as and how one's reason or one's interest dictates'. The decree does not compel AP or its members to permit publication of anything which their "reason" tells them should not be published. It only provides that after their 'reason' has permitted publication of news, they shall not, for their own financial advantage, unlawfully combine to limit its publication.

*Id.* at 20 n. 18, 65 S.Ct. 1416.

■ Second, the Court is not convinced by Defendants' argument that any injunctive relief will infringe upon their First Amendment right of freedom of association. In support of this argument, Defendants rely on *Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (holding that a state may not require private organization to admit women as full voting members), for the proposition that "[f]reedom of association ... plainly presupposes a freedom not to associate." Defendants apparently argue that any order enjoining them from terminating the JOA necessarily implicates their freedom not to associate with each other. The Court finds otherwise. The Court observes that Defendants voluntarily entered into the JOA to gain the protection of the Newspaper Preservation Act. Although Defendants will be temporarily enjoined from terminating the JOA, there is no element of compelled association because the Advertiser and Star–Bulletin constitute separate entities with independent editorial and reportorial functions. An outcome to the contrary would mean that every time the Court enjoined termination of a contract, this right would be implicated. Accordingly, the Court finds Defendants' First Amendment arguments unconvincing.

## II *POSSIBILITY OF IRREPARABLE INJURY TO THE MOVING PARTY.*

■ The Court recognizes that Congress enacted Section 16 of the Clayton Act to encourage the grant of injunctive relief in order to prevent the threat of irreparable injury. 15 U.S.C. § 26; *see also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 112–13 & n. 8, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Section 16 authorizes courts in private antitrust actions to grant injunctive relief "against threatened loss or damage" proximately resulting from an antitrust violation, and to issue a preliminary injunction upon "a showing that the danger of irreparable loss or damage is immediate." 15 U.S.C. § 26. In the instant case, the Court finds that the State has made a strong showing that it will be irreparably injured if the Termination Agreement is not enjoined.

If the State is able to prove its claims, which the Court has previously concluded is likely, then the Court finds that it will be irreparably injured if a preliminary injunction is not granted. Specifically, the State has shown that Defendants have impaired the circulation of and access to the Star–Bulletin, undermined the relationship between the Star–Bulletin and its advertisers, and adversely affected public perception of the viability of the Star–Bulletin. If these actions are not enjoined now, and the State later prevails, any relief that this Court could afford would be inadequate because the Star–Bulletin would no longer be a viable newspaper. Once closed, the Star–Bulletin is unlikely to be reopened because it will have lost its subscriber and advertiser base. The Court finds that no monetary amount will be able to compensate for the loss of the Star–Bulletin's editorial and reportorial voice, the elimination of a significant forum for the airing of ideas and thoughts, the elimination of an important source of democratic expression,

and the removal of a significant facet by which news is disseminated in the community. *See, e.g., Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

## III  *BALANCE OF HARDSHIPS.*

■ The Court finds that the balance of hardships tilts sharply in favor of the State. "For this factor, the Court must identify the harm which a TRO or preliminary injunction might cause the Defendants and weigh it against the Plaintiffs' threatened injury." *UARCO Inc. v. Lam,* 18 F.Supp.2d 1116, 1126 (D.Haw.1998) (*citing Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1203 (9th Cir.1980)). As explained above, the economic demise of the Star–Bulletin will impair the ability of this Court to provide the relief requested by the State and will result in the silencing of competing news and editorial voices as well as curtailing, if not eliminating, the competition for advertisers and creators of news, editorial, and entertainment content.

In contrast, the Court finds relatively little cost to Defendants if it grants injunctive relief. Enjoining the Termination Agreement means that Defendants will be required to continue publishing the Star–Bulletin in the interim until the Ninth Circuit can rule on Defendants' appeal and, if the Court's decision is affirmed, until the parties can fully litigate this lawsuit. Liberty will not suffer any significant loss because it will continue to earn its guaranteed annual profit for its owners. Although GPC and the Hawaii Newspaper Agency may lose money due to the Star–Bulletin's operating losses, Defendants have presented no evidence that they are not profitable overall. The Court is cognizant of the fact that injunctive relief, no matter how short, will require an interim delay in Defendants' plans and that this delay is not costless. However, when

weighed against the hardships that would be suffered by the State if injunctive relief was not granted, the Court finds that the hardship to Defendants pales.

## IV  *ADVANCEMENT OF THE PUBLIC INTEREST.*

■ In determining the propriety of granting injunctive relief, the Court must also consider whether the public interest will be advanced by granting the preliminary relief. *See Miller v. California Pacific Med. Center,* 19 F.3d 449, 456 (9th Cir.1994); *UARCO Inc. v. Lam,* 18 F.Supp.2d 1116, 1126 (D.Haw.1998). The Court finds that the State has demonstrated that the public interest strongly weighs in favor of granting injunctive relief. As shown by the Newspaper Preservation Act, there is a strong public interest in maintaining a newspaper press editorially and reportorially independent and competitive. *See* 15 U.S.C. § 1801. If the Termination Agreement is not enjoined, the Court finds that the loss of the Star–Bulletin's independent editorial and reportorial voices, the loss of competition to attract advertisers and creators of news, editorial, and entertainment content, and the loss of over 100 jobs would severely harm the public interest. Accordingly, the Court finds that this factor weighs in favor of granting injunctive relief.

### *CONCLUSION*

After carefully weighing all four of these factors, the Court GRANTS the State's motion for a preliminary injunction. From the date hereof and for the duration of this lawsuit, Defendants are hereby enjoined to preserve the status quo, including without limitation:

1.  Defendants shall take no steps whatsoever to implement, or make any payments under, the Termination Agreement dated September 7, 1999, or any other agreement of like intent or effect;

2.  Defendants shall take, no steps that are contrary to, or inconsistent with, the stated purpose and intent of the Hawaii Joint Operating Agreement–Amendment

and Restatement of Mutual Publishing Plan Agreement of January 30, 1993 to produce high quality newspapers for their readers, improve acceptance for their advertisers, subserve public interest by maintaining the separate identities, individuality and editorial and news freedom and integrity of the Star–Bulletin and the Advertiser;

3. Defendants shall refrain from taking any actions that may cause any material adverse change in the business, including loss of subscribers and advertisers, or financial condition of the Star–Bulletin as a viable going concern.

Pursuant to Rule 65(c), the Court hereby requires the State to post a security. However, in light of the State's financial resources, the Court finds it appropriate to only require the State to post a nominal bond in the amount of $10.000.[9]

IT IS SO ORDERED.

---

**9.** At the hearing, counsel for Defendants expressed concern that any monetary recovery that his clients might have if they prove that the State has wrongly obtained injunctive relief is limited to the amount of the bond. In the event that the State does not confirm that any recovery by Defendants is not limited to the amount of the bond, and such confirmation is not filed within five (5) days of the date of this Order, the Court will reconsider the amount of the bond upon motion made by either party.