UNITED STATES of America, Plaintiff

v.

**DAILY GAZETTE COMPANY
and MediaNews Group,
Inc., Defendants.**

Civil Action No. 2:07–0329.

United States District Court,
S.D. West Virginia,
at Charleston.

June 19, 2008.

Bennard J. Matelson, Bernard M. Hollander, David L. Meyer, J. Robert Kramer, Jennifer A. Wamsley, John R. Read, Mark A. Merva, Matthew J. Bester, Thomas O. Barnett, Thomas J. Horton, William H. Jones, II, U.S. Department of Justice, Washington, DC, Charles T. Miller, Stephen M. Horn, U.S. Attorney's Office, Charleston, WV, for Plaintiff.

Ambika J. Biggs, Lee H. Simowitz, Ronald F. Wick, Baker & Hostetler, Donald I. Baker, W. Todd Miller, Baker & Miller, Washington, DC, Benjamin L. Bailey, Brian A. Glasser, Bailey & Glasser, John R. Hoblitzell, Michael T. Chaney, Kay Casto & Chaney, David A. Barnette, Jackson Kelly, Charleston, WV, Alan L. Marx, Steven C. Douse, King & Ballow, Nashville, TN, Gary L. Halling, Thomas D. Nevins, Sheppard Mullin Richter & Hampton, San Francisco, CA, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JOHN T. COPENHAVER, JR., District Judge.

Pending is the motion of the Daily Gazette Company ("Gazette Company") and MediaNews Group, Inc. ("MediaNews") to dismiss. The motion is the subject of well written briefs by the parties and the *amici.*

### I.

A. Background

The *Charleston Gazette* and *Charleston Daily Mail* (collectively the "dailies" or "newspapers") were founded respectively

in 1873 and 1880. (Compl.¶ 13). The newspapers operated independently of one another until 1958, when their owners entered into, as partners, a Joint Operating Agreement ("1958 JOA").[1] (*Id.*)

The 1958 JOA combined the dailies' printing, advertising, subscription sales, and distribution functions under a single management structure known as Charleston Newspapers. (Compl.¶¶ 2, 13). All significant business decisions regarding Charleston Newspapers, including the newspapers' individual budgets, advertising rates, and subscription rates, were approved by a JOA committee composed equally of the dailies' representatives as equal joint venture partners. (*Id.* ¶ 2, 14). The partners also shared Charleston Newspapers' profits and losses equally. (*Id.* ¶ 15).

The newspapers remained separately owned, with their own editorial and reportorial staffs, and competed vigorously for readers over the years by (1) attempting to break newsworthy stories first, (2) generating information of interest, (3) attempting to cover local news with greater depth, breadth, and accuracy, and (4) offering the most attractive mix of news, features, and editorials. (*Id.* ¶ ¶ 2, 13, 14, 16). Both newspapers remained consistently profitable through May 2004. (*Id.* ¶ 17).

As of 1998 the respective owners of the *Charleston Gazette* and *Charleston Daily Mail* were the Gazette Company and MediaNews. (Compl.¶ 14). On August 23, 1998, the Gazette Company and an assignee of MediaNews entered into an Amended and Restated Joint Venture Agreement ("1998 JOA"). (Attach. A at 2, Defs.' Mot. to Dismiss). In late 2003, Media-News negotiated to sell the *Charleston Daily Mail* and MediaNews' 50% stake in the JOA ("the assets") to an experienced third-party newspaper company for $55 million. (*Id.* ¶ 18). On May 7, 2004, acting pursuant to a 1998 JOA right-of-first refusal provision, the Gazette Company matched the third-party offer and purchased the assets. (*See id.* ¶ 19).[2]

---

1. According to a 2000 report from the Antitrust Division of the Department of Justice, "In 1910, 58% of U.S. cities had more than one competing daily newspaper.... Today, of the 1,400 cities that have a local daily newspaper of general circulation, fewer than 20 have more than one." (Rep. of Asst. Att. Gen. at Attach. C, Defs.' Mot. to Dismiss). The accuracy of the "fewer than 20" figure is doubtful inasmuch as West Virginia alone has 2 dailies in each of the three cities of Charleston, Wheeling, and Parkersburg. West Virginia Legislature, Senate Clerk's Office, *West Virginia Blue Book* 735–36 (2007).

Many daily newspapers find it increasingly difficult to compete in a media market so radically altered by the shift of readers and advertising dollars to the Internet. *See* Richard Pérez–Peña, *An Industry Imperiled by Falling Profits and Shrinking Ads,* New York Times (Feb. 7, 2008).

2. One commentator noted recently that 10 JOAs remain in existence:

The existing JOAs as of Aug. 9, 2007, by city, member newspapers, and expiration date are: Albuquerque, Journal/Tribune, 2022; Charleston (W.Va.), Gazette/Daily Mail, 2036; Cincinnati, Enquirer/Post, 2007; Denver, Post/Rocky Mountain News, 2050; Detroit, Free Press/News, 2089; Fort Wayne (Ind.), Journal Gazette/News Sentinel, 2020; Salt Lake City, Desert News/Tribune, 2012; Seattle, Times/Post–Intelligencer, 2033; Tucson Arizona Star/Citizen, 2015; York (Pa.), Dispatch/Daily Record, 2090.

Jason A. Martin, *Reversing the Erosion of Editorial Diversity: How the Newspaper Preservation Act Has Failed and What Can Be Done,* 13 Comm. L. & Pol'y 63, 64 n. 3 (2008). The number of the listed JOAs is down to 9 by virtue of the demise of the Cincinnati JOA. *See* Business Courier of Cincinnati, *Cincinnati Post Ceases Publication; Ky. Web News Site to Launch, available* at http://www.bizjournals.com/cincinnati/ stories/2007/12/31/ daily2.html (Dec. 31, 2007) ("The Cincinnati Post ... published [its] ... last issue[] Monday.

## B. The May 7, 2004, Transactions

The United States contends the May 7, 2004, transactions lessened competition in pursuance of a monopoly. Specifically, it is alleged that the Gazette Company gained control of the *Charleston Daily Mail's* assets and MediaNews' 50% ownership interest in the Charleston JOA. (*Id.* ¶ 20). The United States asserts that MediaNews purports to provide management and supervision services for the *Charleston Daily Mail* in return for a fixed fee paid by the Gazette Company, but in reality the Gazette Company now sets the news and editorial budget for the *Charleston Daily Mail* and may terminate its publication at any time. (*Id.* ¶¶ 12, 20).

The United States additionally alleges that the Gazette Company took immediate steps to shutter the *Charleston Daily Mail*. (*Id.* ¶ 19). The plan centered on a rapid reduction of the *Charleston Daily Mail's* subscriber base in the hopes the newspaper would qualify as a "failing company" within 2 to 3 years. (*Id.* ¶ 19). The United States explains the significance of the "failing company" argument:

> Over the years, the Department of Justice has elected not to challenge the decision of several newspaper companies to stop publishing one of the newspapers in a JOA based on a demonstration that circulation for the newspaper had shrunk to the point where the paper was not economically viable and no buyer could be found.

(*Id.* ¶ 19).

It is alleged that following the May 7, 2004, transactions, the Gazette Company, *inter alia*, stopped conducting the following activities respecting the *Charleston Daily Mail:* (1) all promotions and dis-

counts, (2) solicitation of new readers, (3) daily delivery to thousands of customers, and (4) publishing a Saturday edition. (*Id.* ¶ 22). Additionally, it is contended that the Gazette Company affirmatively (1) attempted to convert existing *Charleston Daily Mail* customers to the *Charleston Gazette*, (2) allowed almost half of the *Charleston Daily Mail's* reporters to resign without replacement, and (3) reduced the *Charleston Daily Mail* newsroom budget substantially in 2004 and 2005. (*Id.*)

The complaint further alleges that the Gazette Company's actions caused the *Charleston Daily Mail's* circulation to fall from 35,076 in February 2004 to 23,985 in January 2005. (*Id.* ¶ 23). It is said that "[o]nly after learning in or about December 2004 that the Antitrust Division ... was investigating the May 7[, 2004] transactions did ... Gazette Company take any steps to limit further damage to the *Charleston Daily Mail* caused by" the aforementioned actions. (*Id.*).

In sum, the United States alleges the May 7, 2004, transactions have (1) substantially lessened competition in the Charleston local daily newspaper market, and (2) given the Gazette Company a monopoly in that market. (*Id.* ¶ 31).

The United States alleges three violations of federal antitrust laws arising out of the May 7, 2004, transactions as follows: (1) Count I—substantial lessening of competition and actions tending to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, (2) Count II—a contract, combination or conspiracy unreasonably restraining trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and (3) Count III—willful monopolization activities

---

[E.W.] Scripps [Company] decided to shut down the newspaper[ ] after Cincinnati Enquirer owner Gannett Co .... said it would

not renew a 30–year–old joint operating agreement.").

through anticompetitive and unreasonably exclusionary conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (*Id.* ¶¶ 35, 39, and 44).

## II.

### A. Governing Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing ... entitle[ment] to relief." Fed.R.Civ.P. 8(a)(2). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted...." Fed.R.Civ.P. 12(b)(6).

The required "short and plain statement" must provide " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled on other grounds, Twombly,* 127 S.Ct. at 1969); *see also Anderson v. Sara Lee Corp.,* 508 F.3d 181, 188 (4th Cir.2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions...." *Twombly,* 127 S.Ct. at 1965. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.*

The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an element" of the claim. *Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 349 (4th Cir. 2005) (quoting *Iodice v. United States,* 289 F.3d 270, 281 (4th Cir.2002)). Instead, the opening pleading need only contain "[f]actual allegations ... [sufficient] to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965. Stated another way, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

Application of the Rule 12(b)(6) standard also requires that the court " 'accept as true all of the factual allegations contained in the complaint....' " *Erickson v. Pardus,* —— U.S. ——, ——, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Twombly,* 127 S.Ct. at 1965); *see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.,* 372 F.3d 245, 255 (4th Cir.2004) (quoting *Franks v. Ross,* 313 F.3d 184, 192 (4th Cir.2002)). The court is additionally required to "draw[ ] all reasonable ... inferences from those facts in the plaintiff's favor...." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir. 1999).

### B. The Sherman and Clayton Acts

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 respectively, and section 7 of the Clayton Act, 15 U.S.C. § 18, provide pertinently as follows:

> Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony....

15 U.S.C. § 1.

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony....

15 U.S.C. § 2.

> No person engaged in commerce ... shall acquire ... the whole or any part of the stock ... and no person subject

to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce ... where ... the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . . .

15 U.S.C. § 18.

 The elements of proof for each offense are well-settled in this circuit. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 202–03 (4th Cir.2002) ("To establish a violation of § 1 of the Sherman Act, ... [one] must prove ... (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade. . . . [It must additionally be proven thereafter that there exists an] antitrust injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 710 (4th Cir.1991) ("While section one of the [Sherman] Act focuses on concerted action, monopolization under section two involves the actions of a single firm to control a market. . . . Two elements comprise the offense of monopolization: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' ") (citations omitted); *California v. American Stores Co.*, 495 U.S. 271, 284, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990)("Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition' " or to tend to create a monopoly. 15 U.S.C. § 18.).(citations omitted).

### C. Analysis of the Claims Alleged

 Regarding the section 1 Sherman Act claim, the United States alleges that the 2004 transactions unreasonably restrained trade in the Charleston local daily newspaper market. The transactions are alleged to have eliminated the incentives for defendants to compete and provided the Gazette Company the power to control and eliminate the *Charleston Daily Mail.*

 Respecting the section 2 Sherman Act claim, it is alleged that the May 2004 transactions resulted in the Gazette Company possessing substantial monopoly power in the sale of local daily newspapers in the Charleston area. The power was allegedly obtained when the Gazette Company acquired its only competitor in the same Charleston market.

 Respecting the section 7 Clayton Act claim, the United States alleges that the Gazette Company's acquisition of the *Charleston Daily Mail* and MediaNews' 50% share of Charleston Newspapers lessened competition and created a monopoly in the relevant market. It is alleged the acquisition harmed competition by eliminating the economic incentives previously existing for each owner to increase the attractiveness of its daily. It is further alleged that the 2004 transactions reduced the output of the newspapers from both a quantitative and qualitative perspective, along with increasing prices to subscribers and advertisers.

The complaint on its face appears to satisfy the pleading requirements found in *Twombly* and its progeny. Of particular note is the United States' allegation that the 2004 transactions "extinguished competition between Charleston's two daily newspapers ... as part of a plan to terminate the publication of the *Charleston Daily Mail* and leave Charleston with a single daily newspaper." (Compl.¶ 1). Never-

theless, defendants move to dismiss, asserting the pleading fails to demonstrate a plausible right to relief. The argument is based upon defendants' contentions that (1) the 1958 JOA and 1998 JOA, along with the 2004 transactions, created an economically integrated joint venture that does not offend federal antitrust law, citing and relying principally upon *Texaco Inc. v. Dagher*, 547 U.S. 1, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006)[3]; (2) the commercial competition protected by federal antitrust law does not exist within a JOA because such agreements, pursuant to the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§ 1801–04, completely eliminate all but editorial competition which, defendants say, is non-commercial and, as such, beyond the reach of the antitrust laws, and (3) the 2004 transactions are immune from antitrust liability pursuant to the NPA.

### D. Economically Integrated Joint Venture Under *Dagher*

In *Dagher*, Shell Oil Company ("Shell") and Texaco, Inc. ("Texaco"), joined forces after years as competitors in refining oil and marketing gasoline. Both Shell and Texaco devoted their domestic refining and marketing operations to a joint venture known as Equilon that refined and marketed both the Shell and Texaco gasoline brands. The Supreme Court held it was not *"per se* illegal under § 1 of the Sherman Act ... for a lawful, economically integrated joint venture to set the prices at which the joint venture sells its products."[4] *Id.* at 3, 126 S.Ct. 1276.

Defendants' jointly undertaken activities resemble in some respects the Texaco/Shell Oil arrangement at issue in *Dagher*. For example, the dailies yet maintain some separate operations, notably in the editorial and reportorial functions of their businesses. So, too, was the case in *Dagher*, inasmuch as the two energy companies separately explored for and produced crude oil and maintained some control over their respective brands that arguably affected their attractiveness and worth in the eyes of the consumer and potential acquisitors.

The United States, however, alleges that the Gazette Company has, by acquisition of all the assets of the joint venture, acquired ownership and control of the *Charleston*

---

**3.** Defendants also discuss *Broadcast Music, Inc. v. Columbia Broadcasting*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), as instances when the Supreme Court "strongly suggested that where two firms have combined their operations to the extent that they share financial risks and rewards for the products they produce, they have lawfully eliminated competition between themselves by becoming a single economic entity." (Defs.' Memo. in Supp. at 16). They further contend, however, that *Dagher* "removed any doubt that this is the case." (*Id.*)

**4.** Last Term the Supreme Court explained the meaning ascribed to the *per se* rule and the counterpart rule of reason that inform application of the Sherman Act:

The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1 [of the Sherman Act]. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." ...

The rule of reason does not govern all restraints. Some types "are deemed unlawful *per se.*" The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.... Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices or to divide markets.

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* —— U.S. ——, 127 S.Ct. 2705, 2712–13, 168 L.Ed.2d 623 (2007) (citations omitted).

*Daily Mail* and has done so for the purpose of closing it down. The proper characterization of the joint venture here would appear to require a fact specific undertaking. The skeletal JOAs and 2004 transactions aside, the degree of integration is a fact-based one that will be aided by discovery. *See* 2 Spencer Weber Waller, *Antitrust & American Business Abroad* § 12:26 (3rd. ed 2007) ("The legality of a joint venture will depend on the purpose and nature of the enterprise, the situation of the partners, and their place in the market. . . . Legality turns on net competitive effects and probabilities and for the most part falls outside the area of per se violations."); James H. Holden, *Joint Ventures and the Supreme Court's Decision in Texaco, Inc. v. Dagher: a Win for Substance Over Form*, 62 Bus. Law. 1467, 1473 (2007) ("It has long been thought that the more integrated the joint venture, the more likely the joint venture is to be a single entity and avoid per se liability. The practical difficulty, though, has been determining the degree of necessary integration.") (footnote omitted).[5]

The importance of a fully developed record is also particularly significant here in view of the distinctive media combination involved. In *Dagher*, one would expect that the market for the widely available, and largely fungible, commodity involved, gasoline, was laden with other competitors such as ARCO, Chevron, 76, Circle K, and Mobil.[6] The same is not true respecting the sale of newspapers in Charleston.

Indeed, this case may present a lack of integration in an interesting respect, illustrated by Judge Fernandez' dissent from the court of appeals' decision that was reversed in *Dagher*. Judge Fernandez noted both the *bona fide* nature of the complete integration achieved in *Dagher* and, importantly, how it differed from a newspaper joint venture:

> Nor can it be that this is a case like *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). There, two newspapers formed a third corporation for the principal purpose of eliminating competition, but each remained in the same business in the same area, *and retained the production of the true product—news and editorials—in its own hands*. Moreover, the newspapers themselves—not the new entity—jointly set the subscription and advertising rates. None of that is true here. *Equilon owned all of the assets, all of the obligations, and, in a word, the whole business. It set the prices. It was a separate entity;* a fact that the Independent Operators seem unable or unwilling to grasp.

*Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108, 1125–26 (9th Cir.2004), Fernandez,

---

**5.** In addressing this very case, several commentators within a lengthy, joint article observed as follows:

> If Defendants [Gazette Company and MediaNews] prevail on the Motion to Dismiss, this would seem to be a judicial holding that one of the newspapers in a JOA may be eliminated by the parties without the government even being given the opportunity to discover the facts and circumstances. This would grant JOA owners a freedom and certainty they arguably do not presently possess.

Practising Law Institute, Conrad M. Shumadine *et al., Antitrust and the Media*, 917 PLI/

Pat 393, 410 (Nov.2007). The authors additionally assert that "[s]ome of those who would argue for a broad right to close one of the two newspapers in a JOA might also agree that the facts and circumstances should be subject to discovery and judicial scrutiny of the facts." *Id.*

**6.** Although not a source suggested by the parties, the commonly available website known as californiagasprices.com shows each of these retail gasoline brands are sold in California along with Shell and Texaco.

J., dissenting, *rev'd* 547 U.S. 1, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) (emphasis supplied).

As noted, *Dagher* dealt with a rather fungible product, gasoline. It would seem of comparatively little moment to allow the unification of two branded products seemingly so inseparable in nature. The similar unification of newspaper brands, or elimination of one daily in favor of the other, appears to present concerns not contemplated by *Dagher*. *See Reilly v. Hearst Corp.*, 107 F. Supp.2d 1192, 1195 (N.D.Cal.2000) (noting "the Sherman Act and Clayton Act should be read bearing in mind the legislative purposes that prompted enactment of the NPA; namely, encouragement of multiple sources of newspaper news, features and opinion.... Under this statutory framework, the elimination of a newspaper represents a cognizable injury to interests protected by the antitrust laws...."); Maurice E. Stucke & Allen P. Grunes, *Antitrust and the Marketplace of Ideas*, 69 Antitrust L.J. 249, 271 n. 105 (2001) ("The purpose of this limited [NAP] antitrust exemption is to preserve the editorial competition between local daily newspapers when one of the newspapers might otherwise exit the market.").

While the issue is deferred pending development of the factual record, it is of some significance whether "the true product—news and editorials" remains under the dailies' separate control, a matter that is presently the subject of vigorous debate. In this connection, the continued viability of reportorial competition is worthy of further scrutiny with the benefit of a developed evidentiary record.

Based upon the foregoing, the court declines to dismiss the case at this stage based upon *Dagher*.

## E. Competition Eliminated by Prior JOAs

Defendants' remaining arguments implicate the NPA. The background leading to enactment of the NPA, a history important to proper application of the Act here, is summarized in *Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285 (D.C.Cir.1989):

In 1964, the Department of Justice initiated an investigation of newspaper JOAs, and in 1965 it sued the publishers of two daily newspapers in Tucson, Arizona, which operated jointly, for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and section 7 of the Clayton Act, 15 U.S.C. § 18. The trial court in that suit found violations of all of those provisions, and the Supreme Court upheld that finding in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

The Court rejected the newspapers' argument that the so-called "failing company" defense—a judicially created doctrine—absolved them from liability under the anti-trust laws. Under the "failing company" doctrine, conduct which would otherwise violate antitrust laws does not do so if one of the suspect businesses "faced the grave probability of business failure." The doctrine is based on the notion that a merger between two competitors, one of which is failing, cannot have an adverse effect on competition, because the failing company would disappear as a competitive factor whether or not the merger occurred.

....

Congress reacted to *Citizen Publishing* by passing the Newspaper Preservation Act, which established a less stringent test for newspapers seeking a JOA. Congress ... felt that "the economics of the newspaper industry make it more

likely for newspapers to fail when faced with competition than other businesses." As the Senate Judiciary Committee noted, "when a newspaper is failing it is harder to reverse the process and it is almost impossible to find an outside buyer." The NPA therefore provides that a newspaper is "failing" and eligible for a JOA when it is "in probable danger of financial failure." 15 U.S.C. § 1802(5). The statute also includes what Congress meant to be a less strict standard for JOAs already existing in 1970. A pre-statute JOA is not unlawful if at the time at which such arrangement was entered into, not more than one of the newspapers involved was "likely to remain or become a financially sound publication." 15 U.S.C. § 1803(a).

*Id.* at 1287–88 (citations omitted); *see also Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 744–45 (9th Cir.1996).

The proper reach of the NPA in this action must also take account of its stated purpose:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. § 1801.

 Defendants contend that the JOAs preceding the 2004 transactions necessarily eliminated competition in the relevant market. Defendants assert that (1) both Congress and the Department of Justice recognized when the NPA was passed that JOAs eliminate all commercial competition, and (2) the complaint fails to identify any commercial competition that could be reduced or eliminated.

Regardless of whether or not defendants correctly assess the views of members of Congress and the Department of Justice at the time of passage, the law as enacted warrants a different conclusion. *See Zuni Public Schools Dist. No. 89 v. Department of Educ.*, 550 U.S. 81, 127 S.Ct. 1534, 1551–52, 167 L.Ed.2d 449 (2007) (observing that Supreme Court precedent "is full of statements such as 'We begin, as always, with the language of the statute,' *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001), and replete with the affirmation that, when '[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history,' *United States v. Gonzales*, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997).") (Scalia, J., dissenting). The first clause of section 1801 contemplates continued competition between editorially and reportorially distinct voices. In *Hawaii ex rel. Anzai v. Gannett Pacific Corp.*, 99 F.Supp.2d 1241 (D.Haw.1999), *aff'd*, No. 99–17201, 1999 WL 1039700 (9th Cir. Nov. 15, 1999), the district court aptly opined as follows:

> Defendants argue that there can be no antitrust violation because there is no economic competition at all in light of the Newspaper Preservation Act's antitrust exemptions. The Court recognizes that the Advertiser and Star–Bulletin operate to some extent as a single economic entity under the JOA. However, as discussed below, *these actions receive antitrust exemption only so long as they are taken to preserve the independent editorial and reportorial voices of competing newspapers.* In the instant case, the Termination Agreement contravenes the stated purpose of *the Newspaper*

*Preservation Act because it will lead to the shutdown of the Star–Bulletin ....* *Id.* at 1249 (emphasis supplied).

Economic reality indicates that a JOA does not eliminate all commercial competition, as more fully set forth below. Accordingly, the better course, as noted in the preceding section, is to permit development of the evidentiary record respecting how and in what ways, if at all, competition has been lessened by the 2004 transactions.

Defendants' second contention reduces to the argument that editorial competition is not commercial in nature and, hence, is beyond the reach of antitrust laws. To the extent that the preceding analysis does not dispose of the contention, defendants rely upon two inapposite authorities in advancing the argument, *Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir.1996), and *Committee for Independent P–I v. Hearst Corp.*, 704 F.2d 467, 474 (9th Cir.1983). The decision in *Bronster* addressed whether the NPA preempted state regulation of the JOA there involved. *Bronster*, 103 F.3d at 750 ("Since Congress has preempted any attempt by a state to regulate a newspaper's participation in a JOA, Hawaii cannot impose discriminatory burdens on such newspapers for the purpose of gathering information for legislative reform by Congress."). The issue is distinct from the question now under consideration.

The *Hearst* case likewise did not involve issues presented here. In any event, other language in *Hearst* conflicts with defendants' position. *See Hearst*, 704 F.2d at 477 n. 8 ("There are few, if any, things that affect a business's success which can truly be characterized as noneconomic. A good example is the political viewpoint of a publisher. That viewpoint certainly shows up in the editorial policies of a newspaper. Those policies in turn may either attract or reduce readership.... The Attorney General and Hearst tend to argue that any factors extrinsic to the newspaper operation are 'noneconomic.' That, however, is a shortsighted view, and we reject it ....").

Defendants protest that "[e]ditorial competition for readers' attention, which is all that the complaint alleges, cannot have financial consequences for the JOA parties, because each dollar of advertising revenue and each dollar of subscription revenue went into a common fund (or 'profit pool'), to be distributed to the two parties according to the provisions of their JOA agreement." (Defs.' Memo. in Supp. at 23).

The assertion represents an unduly narrow view of the complaint. As the United States points out, a JOA partner has at least two competitive and economic incentives in pursuing particular editorial and news-gathering efforts that attract readers, subscribers, and advertisers to its own newspaper, namely, (1) increasing its value, particularly in the eyes of potential acquisitors, and (2) enhancing its bargaining position when the JOA is up for renegotiation or termination. Defendants incorrectly assert these facts are absent from the complaint. A fair reading discloses otherwise. *See* Compl. ¶ 15. Additionally, these two observations concerning competitive realities seem to jibe at this early juncture with a non-speculative, commonsense view of the marketplace. In valuing newspapers as a going concern and for saleability purposes, the subscription base would seem foremost among a small bundle of considerations. On that score alone, it is alleged that the Gazette Company's intentional actions severely depleted the *Charleston Daily Mail* subscriber base within a matter of months in 2004, delivering a serious blow to competition in the process.

While defendants might ultimately succeed in their contentions that antitrust

consideration of editorial competition either impermissibly treads upon the First Amendment or fails to offend the antitrust laws as non-commercial competition, neither argument presently has the force meriting action under Rule 12(b)(6). It suffices at this juncture to conclude that (1) the United States' position under the antitrust laws is not so implausible that it ought to be rejected peremptorily, and (2) defendants' First Amendment defense is not so overwhelming that it warrants the pre-discovery demise of this action as a matter of law.

Based upon the foregoing, the court rejects at this stage defendants' contention that the 2004 transactions are beyond the reach of the antitrust laws based upon the NPA.

### F. NPA Immunity

Title 15 U.S.C. § 1803(a) provides pertinently as follows:

> It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was ... entered into ... not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: Provided, That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.

*Id.* The term "joint operating arrangement" is defined as follows:

> any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: Provided, That there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined.

15 U.S.C. § 1802(2).

 Section 1803(a) is properly characterized as an exemption from the antitrust laws. It is thus accorded a narrow construction. *See, e.g., United States v. Gosselin World Wide Moving, N.V.,* 411 F.3d 502, 511 (4th Cir.2005)(stating "[I]t is settled by the maxim that exceptions to the antitrust laws should be construed narrowly."). At the same time, as noted, the court appreciates the salutary purpose behind the NPA, namely, providing an antitrust safe haven of sorts to preserve diverse editorial voices in the community.

The parties differ significantly on several important issues that will inform whether the NPA exemption applies under these circumstances. First, the United States alleges that the Gazette Company now controls both dailies, meaning a protectible JOA no longer exists. *See* 15 U.S.C. § 1802(2) (noting an exempted "'joint newspaper operating arrangement' means any contract, agreement, joint venture ..., or other arrangement entered into by two or more newspaper owners...."). Defendants disagree, asserting that MediaNews, not the Gazette Company, yet "control[s]"

the *Charleston Daily Mail* as that term is understood in 15 U.S.C. 1802(3) ("The term 'newspaper owner' means any person who owns or controls directly, or indirectly through separate or subsidiary corporations, one or more newspaper publications.").

Second, defendants contend that section 1803(a) permits them to "amend" the JOA without the United States' approval. The United States contends, essentially, that defendants are "calling a tail a leg. . . ." *BB & T Corporation v. United States,* No. 07–1177, slip op. at 23 (4th Cir. Apr.29, 2008) ("[W]e are reminded of 'Abe Lincoln's riddle . . . "How many legs does a dog have if you call a tail a leg?"' 'The answer is "four," because calling a tail a leg does not make it one.'"). The United States asserts the 2004 transactions constitute not an amendment, but instead a new, and illegal, agreement under the antitrust laws inasmuch as nothing in the NPA suggests antitrust immunity was intended for a joint operating arrangement partner to acquire the other partner's newspaper without antitrust effect.

In seeking NPA immunity at this point, defendants essentially seek judgment as a matter of law in their favor concerning an apparent affirmative defense. *See Bay Guardian Co. v. Chronicle Pub. Co.,* 340 F.Supp. 76, 81 (N.D.Cal. 1972) ("The Court is of the opinion that the Newspaper Act can only be brought into this action as an affirmative defense to the antitrust claims. Thus it must be pled and proved by the defendants. The United States Supreme Court in *United States v. First City National Bank,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967) so interpreted a similar antitrust exemption."). *Cf. Meacham v. Knolls Atomic Power Laboratory,* —— U.S. ——, 128 S.Ct. 2395, 2933–2401, 171 L.Ed.2d 283 (2008); *Committee for an Independent P–I v. Hearst*

*Corp.,* 704 F.2d 467, 479 (9th Cir. 1983)("When the proponents of the JOA established, as they did here, that the paper was managed reasonably and its trend toward failure is irreversible under any management, we have no difficulty concluding that the burden of proof has been met."). The appropriate resolution of these mixed questions of fact and law, however, along with the parties' remaining arguments, counsel in favor of awaiting development of the evidentiary record. *See Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.2007) (noting a Rule 12(b)(6) challenge, "which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred."). The court declines to find defendants have proven their affirmative defense as a matter of law at this early juncture.

## III.

As noted, it is incumbent upon the court in resolving a motion to dismiss to "'accept as true all of the factual allegations contained in the complaint . . . [,]'" *Erickson v. Pardus,* —— U.S. ——, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Twombly,* 127 S.Ct. at 1965); *see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.,* 372 F.3d 245, 255 (4th Cir.2004) (quoting *Franks v. Ross,* 313 F.3d 184, 192 (4th Cir.2002)), along with "drawing all reasonable . . . inferences from those facts in the plaintiff's favor. . . ." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999).

In view of this plaintiff-centered standard, and consistent with the foregoing discussion, the court ORDERS that defendants' motion to dismiss be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.